(January 20, 1915.)

M. L. HARE and JAMES JUST, Administrator of the Estate of N. A. JUST, Deceased, Respondents, v. W. R. YOUNG, ANDREW LARSON & SONS, a Copartnership Composed of ANDREW LARSON, J. B. LARSON and J. R. LARSON; YOUNG & SORENSON, a Copartnership, Composed of ROY YOUNG and ANDREAS SORENSON, Appellants.

[146 Pac. 107.]

CHATTEL MORTGAGES—DESCRIPTION OF PROPERTY—AFFIDAVIT OF GOOD FAITH—POSSESSION OF PROPERTY—PRESUMPTION OF OWNERSHIP.

1. Personal property described in a chattel mortgage as "1333 early spring lambs, branded O—" is a sufficient description as between the mortgagor and the mortgagee.

2. A chattel mortgage, although not accompanied by an affidavit that it is executed in good faith and without any design to hinder, delay or defraud creditors, is valid as between the mortgagor and the mortgagee.

3. Possession of personal property is *prima facie* evidence of ownership.

4. The evidence in this case examined and the conclusion reached that the trial court was justified in finding that the presumption of ownership created by the possession of the property, under the facts and circumstances in this case, is not overcome by the testimony introduced to rebut it.

APPEAL from the District Court of the Sixth Judicial District, in and for the County of Bingham. Hon. J. M. Stevens, Judge.

Suit to foreclose chattel mortgage. Judgment for plaintiffs. *Affirmed.*

J. W. Jones and Budge & Barnard, for Appellants.

This registration act provides that the lease "must be filed of record in the same county recorder's office or offices and within the same time and manner and for the same fee, as are chattel mortgages."

There is no statutory provision for filing foreign chattel mortgages when the chattels are subsequently brought into this state. The chattel mortgage registration acts apply only to property in the state of Idaho when the mortgage is executed and have no extraterritorial effect. (Secs. 3406–3410, Rev. Codes.) By analogy, a foreign lease of animals, which are subsequently brought to this state, is not required to be placed of record in this state. (*Shapard v. Hynes,* 104 Fed. 449, 45 C. C. A. 271, 52 L. R. A. 675; *Creelman Lumber Co. v. Lesh,* 73 Ark. 16, 83 S. W. 320, 3 Ann. Cas. 108; *Greenville National Bank v. Evans-Snyder-Buel Co.,* 9 Okl. 353, 60 Pac. 249.)

"The statutes of one state requiring mortgages and other instruments dealing with personal property to be recorded in the town or county where the mortgagor resides do not apply to mortgages made in another state where the parties and the property are at the time. The *lex loci contractus* governs." (24 Am. & Eng. Ency. Law, 2d ed., 94; *Pyeatt v. Powell,* 51 Fed. 551, 2 C. C. A. 367.)

The mortgage sought to be foreclosed by this action is void as to the defendant copartnerships because of the insufficiency of the description of the property attempted to be mortgaged. The sole description of the property attempted to be mortgaged is "1333 early spring lambs, branded O——." The location of the property is not stated nor the ownership, nor does the mortgage specify the county or state where the property attempted to be mortgaged is located. (*Huse v. Estabrooks,* 67 Vt. 223, 48 Am. St. 810, 31 Atl. 293; *Barrett v. Fisch,* 76 Iowa, 553, 14 Am. St. 238, 41 N. W. 310.)

"A mortgage of a specific number of sheep out of a herd comprising a much larger number of sheep which does not separate or designate the sheep mortgaged is void for uncertainty." (*Jacobsen v. Christiansen,* 18 Utah, 149, 55 Pac. 562; *South Omaha Nat. Bank v. McGillin,* 77 Neb. 6, 108 N. W. 257; *Wattles v. Cobb,* 60 Neb. 403, 83 Am. St. 537, 83 N. W. 195; *Clark v. Voorhees,* 36 Kan. 144, 12 Pac. 529; *Everett v. Brown,* 64 Iowa, 420, 20 N. W. 743.)

The mortgage is void because the property attempted to be described was not *in esse* and the mortgagor had no potential interest in or title to the ewes from which the lambs were subsequently born. (Jones on Chattel Mortgages, 2d ed., sec. 140; *New England Nat. Bank v. Northwestern Nat. Bank,* 171 Mo. 307, 71 S. W. 191, 60 L. R. A. 256; *Townsend Brick etc. Co. v. Allen,* 62 Kan. 311, 84 Am. St. 388, 62 Pac. 1008, 52 L. R. A. 323; *First Nat. Bank v. McIntosh & Peters Livestock etc. Co.,* 72 Kan. 603, 84 Pac. 535, and *Robinson v. Haas,* 40 Cal. 474.)

Mortgage is void as to defendant copartnerships because of lack of affidavit of good faith. (*Reynolds v. Fitzpatrick,* 23 Mont. 52, 57 Pac. 452; 2 Cobbey, Chattel Mortgages, sec. 583; 6 Cyc. 1002.)

Hansbrough & Gagon, for Respondents.

The person who has the possession and control of a chattel and the person in possession and control of an article of personal property and who holds himself out as the owner thereof, is presumed to be the owner. (29 Cyc. 1550; *Keith v. Maguire,* 170 Mass. 210, 48 N. E. 1090; *Hornbein v. Blanchard,* 4 Colo. App. 92, 35 Pac. 187.)

The leases in question should have been recorded within a reasonable time after sec. 1263, Rev. Codes, went into effect. (*Moline Plow Co. v. Witham,* 52 Kan. 185, 34 Pac. 751.)

By comity between the states, mortgaged property being removed from one state to another and the mortgage not recorded in the latter state, the mortgagor is permitted to retain possession under the terms of the mortgage, but such comity should not be extended to cases wherein it appears that the mortgagee consented to such removal. (*Newsum v. Hoffman,* 124 Tenn. 369, 137 S. W. 490; *Snyder v. Yates,* 112 Tenn. 309, 105 Am. St. 941, 79 S. W. 796, 64 L. R. A. 353; *Greene v. Bently,* 114 Fed. 112, 52 C. C. A. 60; *Dawes v. Rosenbaum,* 179 Ill. 112, 53 N. E. 585.)

Where a true owner of property allows another to appear as the owner of or as having full power of disposition over the property, and innocent third parties are thus led into deal-

ing with such apparent owner, or person having such apparent power of disposition, they will be protected. (16 Cyc. 773, 774; *Anderson v. Armstead*, 69 Ill. 452; *Wells v. Higgins*, 1 Litt. (Ky.) 299, 13 Am. Dec. 235; *Craig v. Turley*, 86 Ky. 636, 6 S. W. 648; *Wilson v. Scott*, 13 Ky. Law Rep. 926; *Hostler v. Hays*, 3 Cal. 302; *B. F. Avery & Sons v. Collins* (Tex. Civ. App.), 131 S. W. 426.)

The mortgage is good between the parties. (*Marchand v. Ronaghan*, 9 Ida. 95, 72 Pac. 731; *Chase v. Tacoma Box Co.*, 11 Wash. 377, 39 Pac. 639; *Marcum v. Coleman*, 8 Mont. 196, 19 Pac. 394; *Reynolds v. Fitzpatrick*, 23 Mont. 52, 57 Pac. 452; *Darland v. Levins*, 1 Wash. 582, 20 Pac. 309.)

MORGAN, J.—This case was tried in the district court immediately following the trial of that just decided by this court, in which the same parties appellant and respondent appeared, and in which case the foreclosure of a mortgage made by W. R. Young in favor of the Anderson Brothers Bank was involved. (See *ante*, p. 682, 146 Pac. 104.)

In this case it was stipulated that the testimony of the witnesses John O. Jones, Andrew Anderson, J. B. Larson, W. R. Young and W. A. Lee given on behalf of the defendants in the case involving the Anderson Brothers bank mortgage and all exhibits introduced on defendants' behalf in said case be considered as evidence for the defendants herein, subject to objections made as to its competency, relevancy and materiality, with like effect as if said witnesses had been sworn and said evidence had been introduced.

The two cases came on to be heard in this court at the same time and were argued together. This case, however, presents some questions of law which do not occur in the other and which require, in order that the conclusions of this court be made clear, an additional discussion of the facts.

On January 7, 1911, W. R. Young being indebted to the Shelley Banking Company of Shelley, Idaho, in the sum of $4,000, for moneys theretofore advanced to him, gave to said banking company his promissory note in said amount, and to secure the payment thereof made, executed and delivered to

said bank a chattel mortgage upon the property described as follows: "1333 early spring lambs, branded O—."

By assignment, in like manner as in the case just decided, the respondents became the owners of said note and mortgage and, the indebtedness not having been paid when due, this suit was instituted to foreclose the mortgage.

The defendants (appellants here) Andrew Larson & Sons, a copartnership, and Young & Sorenson, a copartnership, answered and the default of the defendant, W. R. Young, for failure to answer was entered. The trial resulted in a decree foreclosing the mortgage and adjudging and decreeing it to be a valid lien upon the property described therein prior and superior to any right or rights of the defendants or either of them. From said decree this appeal was taken to this court.

In so far as the facts discussed in the case involving the Anderson Brothers Bank mortgage are decisive of this case, they will not be restated here but, as before indicated, this case presents some additional questions which require the consideration of some portions of the evidence not found necessary to be discussed in the other.

It is contended by the appellants that the trial judge erred in not finding that the lambs, not being *in esse* at the time of the execution of the mortgage, and Young having no potential interest in the ewes subsequently giving birth to them, said chattel mortgage was wholly void; also in not finding that the description of the property in the mortgage is so indefinite as to render it void; that the appellants being purchasers of the property in good faith and for value, the mortgage, as against them, was void because it was not accompanied by an affidavit that it was executed in good faith and without any design to hinder, delay or defraud creditors. Other assignments of error were made but they go to the points above stated.

These assignments of error are all based upon the theory that the appellants were purchasers of the property without notice of the mortgage, in good faith and for value, from Jones, Anderson, Lund and the Christensens, and that at the time the purchases were made the said vendors were the

actual owners of the property and Young, the mortgagor, was not, for if Jones, Anderson, Lund and the Christensens were not the owners of the property, it is clear the appellants could not acquire ownership by purchase from them. This mortgage as between the mortgagor and the mortgagee is valid and the description is sufficient.

In the case of *Marchand v. Ronaghan*, 9 Ida. 95, 72 Pac. 731, this court, after holding that between mortgagor and mortgagee the affidavit of good faith is unnecessary, commenting upon the defense that the description in a chattel mortgage was insufficient, said:

"It was proper for the plaintiff to prove where the property was located and identify it as the property mortgaged. It could in no way injure the mortgagor. The strictness of the rules applied to chattel mortgages where disputes arise between the mortgagee and attaching creditors and subsequent encumbrancers and purchasers in good faith is never applied where the differences arise between the mortgagor and mortgagee; and the courts will not look with favor upon the efforts of a mortgagor to defeat the security given his creditors upon such flimsy pretexts." (See, also, *Rea v. Wilson*, 112 Iowa, 517, 84 N. W. 539.)

One of the questions determined by the trial judge and here to be decided is, Was the mortgagor at the time the mortgage was made the owner of the property mortgaged?

While it appears from the testimony of Jones, Anderson and Young that Young leased the sheep in question from Lund, the Christensens, Jones and Anderson, and that said parties owned them up to the time they were sold to the appellants, the conduct of said parties, with respect to the property, tends to contradict this testimony. According to the testimony the other parties above named had known Young in the state of Utah for a number of years, and from 1902 or 1903 until 1910 they, from time to time, placed in his possession about 6,700 head of sheep upon contracts or agreements, whereby he was to make payment in some instances in cash and in other instances in wool and lambs for the use of the sheep. Some of these contracts were oral and others, while

called leases in the testimony, are very informal. Two of these documents were introduced in evidence and are as follows:

"Shelley, Idaho, Oct. 9/1904.

"I the undersiner received of John O. Jones 956 ewes and 240 ewes lambs and 17 bucks to be kept for the terms of four years at the yearly rent of two lbs of wool for each head and six lambs on each one hundred head of sheap to be added yearly. And said sheep are to young good sheep at the time of delivery.

"Remarks.

"John O. Jones stood one half of expence of shipmert said sheep said amount was $99.00.

"Should John O. Jones at time of receiving said sheep return them to Utah by rail I agree to pay the same amount And in addishon I have allready gave to John O. Jones one contract writen in year 1903 and for the terms of 5 years on the same said sheep. It was sined by W. R. Young and lost by said John O. Jones. Should said contract ever be found it shall be null and void and of no effect.

"Signed by W. R. YOUNG."

"Maroni, Utah, Sept. 15, 1910.

"Received from Andrew Anderson of Maroni, Utah Eleven Hundred head of Stock Sheep to be kept by me for the term of three years, for which I agree to pay 50 cts in cash for each sheep per year as rent, said cash to be payed July 1st of each year and at the end of said three years I agree to deliver to Andrew Anderson, his heirs or order, the said Eleven Hundred (1100) head of stock sheep in good condition.

"W. R. YOUNG."

Young removed from Utah to Idaho about 1904 and engaged in the livestock business. He always dealt with the sheep in question as his own. His testimony is in part as follows:

"Q. In April, 1911, how many sheep all told did you have in your possession? A. Something over 3,000 in April.

"Q. Three thousand in April? A. Somewhere near 6,000.

"Q. How many sheep did you have about March, 1911, in your possession that you claimed to lease from Jones and Anderson in Sand Peak county? A. Over 3,000.

"Q. And in March of that same year 1911 counting the Christensen sheep and the Anderson and Jones sheep you had something over 6,000? A. No, I didn't say that.

"Q. How many did you have? A. Close to 6,000.

"Q. What sheep was it you mortgaged to the Anderson Brothers Bank on December 19, 1910? A. These same sheep.

"Q. Which sheep do you refer to by these same sheep? A. All that I had.

"Q. That would cover the Christensen and Lund sheep and also the Jones and Anderson sheep? A. Yes.

"Q. How many sheep, if you know, did you describe in that mortgage? A. Three thousand.

"Q. But you had in your possession about that time about 6,000? A. I did not.

"Q. How many did you have? A. About 3,000 or a little over.

"Q. Where were those others? A. I didn't count the lambs.

"Q. The lambs of what season? A. In 1911, this was in December, 1910, that mortgage to Anderson.

"Q. In December, 1910, you say you had only about 3,000 head of sheep? A. Yes.

"Q. I understood you to say you got about 3,000 sheep under lease from Lund and Christensen? A. I said so.

"Q. Did you have them in December, 1910? A. Not all of them.

"Q. How many did you have? A. Not all of them.

"Q. How many old ones did you have of the Christensen sheep? A. They were all old ones at that time.

"Q. Going back to the spring of 1910, how many sheep did you have in your possession in the spring of 1910? A. Over 6,000.

"Q. How many old ones? A. Over 3,000.

"Q. That was counting the lambs the spring of 1910? A. Yes.

"Q. What I am trying to get at how many old sheep belonging to Young and Christensen you had in the spring of 1910? A. You can figure that out yourself. I had about 3,000 old sheep; 3,100 belonging to other people, then 3,400 would belong to these people; how many would that make?

"Q. Did you have 3,100 old sheep that you leased from Anderson and Jones? A. No.

"Q. How many old sheep did you have that you leased from Jones and Anderson in the spring of 1910? A. Must have had about 1500.

"Q. How many old sheep did you have in the spring of 1910 of the Christensen and Lund sheep? A. About 1,500.

"Q. Then you didn't have 3,000 and you didn't lease that many sheep from Christensen, did you? A. Yes, I did.

"Q. What have you done with them? A. Sold them and ate them up.

"Q. And what? · A. Sold them.

"Q. How many sheep did you sell out of these two herds. A. I can't tell; I sold the increase every year.

"Q. How many old ones did you sell? A. I sold from two to five hundred old ones at different years.

"Q. What I am trying to get at now is the number of old sheep say nothing about their increase at the time you made the first lease from the Christensens and Lund—got from them under that lease. A. About 2,000, I guess, old ones.

"Q. And how many lambs? A. About 1,800 old ones and about 1,600 lambs.

"Q. What time in the year did you get them? A. Got them in August.

"Q. That was 3,400 head of grown sheep that you had that fall? A. Yes.

"Q. Did you ever sell any of those sheep? A. Yes.

"Q. When did you sell them? A. Sold some that fall and some the next year.

"Q. And still continued to sell? A. Yes.

"Q. Do you know how many you sold that fall? A. About 200.

"Q. And how many the next year? A. I couldn't tell.

"Q. Do you know how many old sheep you had at the expiration of that verbal lease you took from Christensen and Lund when you say you wrote a letter and changed the terms of the lease belonging to them? A. I don't think I had over 2,000. I don't think the old ones had increased any.

"Q. You had been selling the lambs right along? A. Yes.

"Q. Treated these sheep from the time you got them until you turned them back as your own? A. Had full charge of them.

"Q. Sold them when you wanted to and sold the wool when you wanted to? A. With their permission, their part of it.

"Q. But sold those sheep any time you wanted to? A. Yes.

"Q. Any part of them? A. Yes."

The testimony of Anderson is in part as follows:

"Q. Were those dealings with reference to the leasing of certain sheep to W. R. Young? A. Yes.

"Q. On how many occasions did you lease him sheep? A. I don't know how many times.

"Q. When was the first occasion when you had dealings with him of that nature? A. 1904, I think.

"Q. What did you do at that time? A. I leased him 500 head of sheep.

"Q. Where were the sheep at that time? A. They were in his herd, I think.

"Q. In what place? A. I don't know whether they would be in Sand Peak or where."

From other portions of Anderson's testimony it appears that he leased sheep to Young on but two occasions; 1,000 head in 1904 and 1,100 head in 1910.

Anderson further testified as follows:

"Q. When did you first know that Mr. Young had mortgaged those sheep to the Anderson Brothers bank and the Shelley Bank? A. I think he told us about the first of April.

"Q. You said in your direct examination that he told you he had mortgaged some of them? A. He told us he had mortgaged some of them. I don't remember how many.

"Q. That was about the first of April? A. Yes.

"Q. 1911? A. Yes.

"Q. Where were you when he told you that? A. At Goshen.

"Q. Did he tell you to whom they were mortgaged? A. I don't remember whether he did or not.

"Q. Did you make any effort at that time to ascertain who he had mortgaged these sheep to? A. No.

"Q. You didn't care whether they were mortgaged to the Anderson Brothers Bank or Shelley Bank or anybody else? A. Not at that time."

In another place in the record Anderson testified as follows:

"Q. What were you getting under that lease? A. Straight 50 cents a head.

"Q. In cash? A. Yes.

"Q. When were those payments made? A. At the proper shearing time.

"Q. You never were up here when the sheep were shorn? A. No.

"Q. You never had any agent here to claim any wool or wool money for you? A. No.

"Q. And never did anything about putting anybody on their guard as to who owned those sheep, did you? A. Never was up here.

"Q. Never wrote anybody? A. No.

"Q. And so far as you know no one knew but what W. R. Young owned those sheep? A. I don't know as to that."

Without quoting further from the record it may be said that the testimony is intended to show that the sheep claimed by Anderson and Jones were taken from the possession of Young in April, 1911, and by them turned over to Andreas Sorenson, by whom they were kept as the agent of Anderson and Jones until in June, 1911, when they were sold to said Andreas Sorenson and one Roy Young, who, it was admitted in the oral argument, was a relative of W. R. Young, the mortgagor. Prior to this pretended sale the relations between Andreas Sorenson and Anderson and Jones were such that Sorenson issued checks against the funds of his principals in the bank to cover the expense of caring for the sheep and the checks were presented and paid. The sheep repos-

sessed by Lund and the Christensens were taken over by them in July, 1911, and immediately transferred to Larson & Sons.

It seems nearly incredible that the owners of sheep would deliver them over to another under contract of lease, allow him to remove them from the state, fail and neglect to conform to the recording laws of the state to which they were conveyed, permit him to treat them as his own, to sell and otherwise dispose of them until the number had been diminished from 6,700 to 3,000, and then to mortgage the 3,000, without exciting the curiosity of the owners sufficiently to prompt them to inquire as to the amount of the mortgage or to whom it had been given.

These are some of the circumstances disclosed by the record which probably prompted the trial judge to scrutinize the testimony critically and to reach the ultimate conclusion that W. R. Young was the owner of the sheep and that Anderson, Jones, Lund and the Christensens were not.

"Possession of personal property is *prima facie* evidence of ownership." (*Goodwin v. Garr*, 8 Cal. 615; *Courtright v. Deeds*, 37 Iowa, 503; *Trevorrow v. Trevorrow*, 65 Mich. 234, 31 N. W. 908.)

The case last above cited is from the supreme court of Michigan and the syllabus is as follows:

"In an action by an administratrix against the intestate's father to determine the ownership of a team of horses, evidence that the intestate used the team as his own for over one year justified the instruction to the jury that 'the possession of the team under a claim of ownership was presumptive evidence of the ownership, not conclusive, but sufficient until proof was introduced to the contrary,' although it also appeared from the evidence that the father had originally bought and paid for the team."

In this case the trial judge, who heard the testimony and had an opportunity to observe the demeanor of the witnesses on the witness-stand, reached the conclusion that W. R. Young, the mortgagor, was the owner of the property. An examination of the record convinces us that he was justified in this finding and that the presumption of ownership created by

the possession of the property, under the facts and circumstances of this case, is not overcome by the testimony introduced to rebut it.

The decision appealed from is accordingly affirmed and costs are awarded to the respondents.

Sullivan, C. J., concurs.

Budge, J., did not sit at the hearing nor take part in the decision of this case.

Petition for rehearing denied.