182 P.2d 945

In re ODBERG'S ESTATE.

STATE v. ODBERG.

No. 7304.

Supreme Court of Idaho.

July 8, 1947.

Cox, Ware & Stellmon, of Lewiston, for appellant.

Robert Ailshie, Atty. Gen., and Edw. G. Rosenheim, Asst. Atty. Gen., for respondant.

GIVENS, Justice.

Henry Odberg, bachelor, died intestate in Latah County, Idaho, January 9, 1942, leaving as heirs a brother Ellis Odberg and a niece, Cletus Elizabeth Gustafson Morken, and a conceded estate of $160,099.51. Ellis Odberg was appointed administrator and did not inventory as part of the estate, 20 Oregon-Washington Railroad and Navigation Company bonds of $1,000 each, totaling $20,000; one Federal Farm Mortgage bond of $5,000 and six Republic of Argentine bonds of $1,000 each, totaling $6,000, or a grand total of $31,000.

The Commissioner of Finance petitioned in the Probate Court to compel the listing of these bonds as part of the estate and subject to inheritance taxes thereon due the State. Ellis Odberg answered, claiming, the bonds were his individual property, delivered by the deceased in part payment of a debt due arising out of the settlement about 1920 of their joint farming operations with two other deceased brothers, in Latah County. The Probate Court found in favor of Ellis Odberg. The District Judge, on appeal, reversed the Probate Court—hence the appeal hereby Ellis Odberg.

A. L. Lyons, cashier of the American Bank and Trust Company of Lewiston, testified for the State these bonds were purchased between 1937 and 1941 by order of Henry Odberg, then living between Genesee and Juliaetta, with his money and delivered on his order to Ellis Odberg living in Lewiston; that the coupons as they became due were, by Henry Odberg accompanied by Mrs. Ellis Odberg, or by Mrs. Odberg alone, deposited to Henry Odberg's account; they were bearer bonds and coupons, therefore, payable to the holder thereof; that Henry Odberg had no safety deposit box and these bonds were kept in a lock box standing in the name of Mrs. Odberg (Lily), who alone had keys to this box; that Henry Odberg somewhat extensively bought and sold bonds and was better versed than the average in such transactions.

At the time Henry Odberg died, the bonds were in a lock box belonging to Mrs. Ellis Odberg.

Mrs. Morken's husband, Ed. Morken, the other witness for the State, testified he was well acquainted with Henry Odberg, who stayed with the witness and his wife about a year in 1934; and that Henry Odberg frequently discussed with him the purchase and sale of bonds; that Henry Odberg never told him he owed Ellis Odberg anything or that these bonds had been given to Ellis Odberg in payment of any debt; that after the appointment of Ellis Odberg as administrator, the witness and his wife and Mr. and Mrs. Ellis Odberg, had this conversation about February 12, 1942, after being at the American Bank and Trust Company in Lewiston:

"A. Well, we asked him (Ellis) what he intended to do about these securities, whether he intended to put them in the estate or not, and we asked what he intended to do about it, and he said that if those were turned into the estate, a lot would have to be paid out for inheritance tax and he didn't think we should do that. We told him they would have to be turned in to the estate and he said something to the effect that he didn't intend to, and he said something to the effect that, if we didn't turn them in, he would make it right with us, and finally, he didn't make any declaration and we told him—

"Mr. Stellmon: Is that the same conversation?"

"A. (Continuing) Yes, the same conversation. He didn't say that he would turn them in and we told him we were going to see our attorney about it and see if he couldn't be forced to turn them in to the estate, and I believe that concluded the conversation.

"Q. During that conversation, did he claim that he owned the bonds? A. I don't believe that he claimed he owned the bonds."

And that Henry Odberg had three safety deposit boxes, one at the Spokane and Eastern Trust Company, Spokane; one at the First Trust and Savings at Moscow;

and one at the Genesee Branch of the First National Bank of Lewiston.

While the present action is by the State to recover inheritance tax, such recovery may be had only if the bonds in question are part of decedent's estate, in which event the niece would receive her share thereof. The above witness stated in his examination he and his wife were thus interested in these proceedings.

At the conclusion of the State's case, motion for nonsuit was denied, and thereupon, among others, Ethel Evelyn Johnson, a lifelong acquaintance of Henry Odberg, with whom he had gone for 20 to 25 years, and Clarence Trail, testified for the defense so far as material to the issue here.

The District Judge specifically found the testimony of one defense witness other than the two named, was untrue, and though he found in favor of the State, he did not thus condemn the testimony of any other witness for the defense.

The learned trial judge is charged with and given the responsibility of determining the credibility of witnesses. Without evaluating the cogency of his expressed reason for rejecting such testimony, but passively conceding such finding eliminates it, there remains the following:

Miss Johnson testified in substance: that Henry Odberg told her during July 1937, following an accident which he indicated might have killed him, he should have come to a complete settlement with Ellis, which he hadn't done and asked her if she thought he should, and the witness answered yes. Thereafter, they went to the American Bank and Trust Company in Lewiston where, "He (Henry) handed some bonds to Lily (Mrs. Ellis Odberg) and they went to the back of the bank—I sat in front—and put them in the safety deposit box. He said, 'That's payment to Ellis'." That Henry Odberg specifically told her they (the bonds) were turned to Ellis to apply on the indebtedness; that he had never told her how much he owed Ellis, but she had an idea and her idea was more than Ellis says it is.

"Q. Did he ever tell you when that indebtedness was created? A. It was created when the boys were working together; when the boys were working together.

"Q. They never settled when they were working together back in the early days? A. That's right.

\*    \*    \*    \*    \*    \*

"Q. Were you present in Lewiston with him when he ordered the railroad bonds? A. All bonds were ordered at the American Bank.

"Q. In each instance? A. Yes.

"Q. Did Henry Odberg tell you that these bonds were to be purchased and turned to Ellis Odberg in partial payment to Ellis? A. Yes, sir. He told me them bonds were bought for a settlement with Ellis and turned to Ellis on this settlement.

\*    \*    \*    \*    \*    \*

"Q. Did you ever have any conversation with him in the hospital about his transactions with Ellis? A. Yes.

"Q. Tell the Court about that. A. He told me: 'I am awfully glad that I have done what I have done, but I am sorry that I didn't come to a complete settlement with Ellis'.

"Q. How long was that before his death? A. I am not so sure of that. It couldn't have been very long, maybe a week. I am not positive of that.

"Q. Were you ever present at any time when a conversation took place between Henry Odberg and Mrs. Ellis Odberg relative to Washington Water Power bonds? A. Yes.

"Q. Tell the Court about that. A. Why it was the day Henry told Mrs. Odberg the bonds were called. 'What am I going to do?' he says, and she says, 'You are the bond man, do the same thing as before'.

"Q. And she delivered the bonds to him? A. Yes, sir.

* * * * * *

"Q. You said he said that he was happy he had done what he had done? A. Yes.

"Q. Did he say anything as to what he was referring to there? A. He meant those bonds he had turned to Ellis in settlement.

"Q. Did he say that? A. He said he had turned bonds to Ellis in settlement, but he was sorry he hadn't finished it.

"Q. He was glad he had delivered the bonds he had delivered? A. Yes, sir. * * *"

Cross-examination attempted to elicit that in the Probate Court she testified thus:

"Q. I will ask you to state whether or not in that conversation with Mr. and Mrs. Morken, that Mrs. Morken, having a list of bonds that we were discussing, said: 'Here is a list that Ellis is not turning in', and you say, 'Don't worry about that. He will turn them in.' Do you remember that conversation? A. I don't remember.

* * * * * *

"Q. And your answer was, 'I don't believe I ever made that statement', and then the question to you: 'Do you know anything about these bonds?' and your answer was 'I heard them talking about bonds and I knew that Lily and Henry had some business in the bank about bonds.' And then the question, 'Did that conversation take place?' and I believe you answered, 'I think I did say that I knew of some bonds.' And then the question, 'Do you know if Henry gave Ellis all of these bonds?' and you replied, 'I don't know if he gave them, but Lily and Henry were busy in the bank.' And you answered: 'I don't recall that.' And the question, 'Anything resembling it?' and you answered, 'Well, I knew there was a question, but I don't know what I answered them.' Do you remember that conversation? A. That paper they brought out was on Third Street, Moscow, and that conversation wasn't over three or four

minutes. They pulled out a typed paper. At that time we was indebted to Henry's estate, my father and my brothers, and I was interested. I am not familiar with the names of bonds, but at that time they were trying to settle Henry's estate, but I didn't know they were trying to settle whatever bonds. I didn't think they were talking about those bonds. I am not familiar with the names of bonds.

"Q. Did Henry buy bonds through the American Bank at Lewiston that were given to Ellis? A. That I don't know. I know all bonds, when I was with him, were bought for Ellis.

"Q. You were with him every time he bought bonds at the bank? A. I couldn't just say that I was with him, but I know when I was with him that bonds were bought for Ellis. I imagine he went to Lewiston when I wasn't with him, but I know I was with him several times.

"Q. Are you still indebted to the Henry Odberg estate? A. I am not.

"Q. Is your father and brothers? A. My brothers aren't, but I believe there is some on the old place. I am not sure, but I think there is. We were willing to settle that for a long time. I think there is a small indebtment there."

This cross-examination does not militate against the force and effect of her testimony, that these bonds were transferred to Ellis in partial satisfaction of the debt due him and which no State's witness testified had not been a valid obligation. If Ellis Odberg's joint efforts with Henry when they were farming together contributed to the funds used as the purchase price of the bonds and he is merely seeking to recover what is his just due, he certainly is in a more equitable position than the niece.

Clarence Trail, who resided on the Henry Odberg estate at Genesee and evidently had worked for him since 1923, and was jointly engaged in farming with him since the spring of 1935, testified as follows:

"Q. Mr. Trail, during the time that Henry Odberg and you lived there together, did you have any conversation with him about his dealings with Ellis Odberg relative to their farming operations in the early days? A. Lots of times.

"Q. What was the substance of that conversation? A. I heard him say several times that they had never made a complete settlement.

"Q. That Ellis had money coming? A. That was my understanding."

█ The burden of proof is upon the State in a suit to compel an administrator to include unlisted property in an estate, as subject to an inheritance tax. In re Minor's Estate, 180 Cal. 291, 180 P. 813, 4 A.L.R. 456; In re Jones' Estate, 147 Okl. 123, 294 P. 792; In re Valentine's Estate, 297 Pa. 99, 146 A. 453, 64 A.L.R. 737.

The contention that Henry, being expert as to bonds, was buying and crediting them to Ellis and upon same becoming due, purchased others with like purpose is not

unreasonable or uncommon, and certainly not illegal.

"We cannot interpret this testimony to mean that the brother and sister were engaged in such a business adventure as the law characterizes as a partnership. She was merely using the common language of a layman to express the fact that she and her brother pursuant to this agreement were collaborating in the accumulation of securities which should belong to them jointly with right of survivorship. Such an agreement is valid under our law. Malone v. Sullivan, 136 Kan. 193, 14 P.2d 647, 85 A.L.R. 275." Corson v. Oakley, 138 Kan. 520, 27 P.2d 290, 291, at page 296.

The State's evidence proved three things: first, that the bonds, though purchased with Henry's money, were delivered on Henry's order to Ellis Odberg; second, that they were placed and kept in Mrs. Ellis Odberg's lock box in Lewiston, to which she alone had access, when Henry had three other lock boxes; and third, that Henry owned and left other bonds in his estate which were not so kept or treated. The State nevertheless contends these bonds should be considered as part of the estate, because they were purchased by Henry, with Henry's money and the coupons as they became due were credited to his account. The only affirmative evidence, however, in the record outside of the testimony of Mr. and Mrs. Odberg with regard to these bonds and why Henry handled them as he did and put them in the lock box belonging to Mrs. Ellis Odberg, is that of Miss Johnson to the effect they were given by Henry to Ellis Odberg in payment of a debt. The testimony of a witness which is not unreasonable and is not contradicted or impeached, may not be disregarded.

"The rule applicable to all witnesses, whether parties or interested in the event of an action, is, that either a board, court, or jury must accept as true the positive, uncontradicted testimony of a credible witness, unless his testimony is inherently improbable, or rendered so by facts and circumstances disclosed at the hearing or trial. Manley v. Harvey Lumber Co., 175 Minn. 489, 221 N.W. 913, 914. In Jeffrey v. Trouse, 100 Mont. 538, 50 P.2d 872, 874, it is held that neither the trial court nor a jury may arbitrarily or capriciously disregard the testimony of a witness unimpeached by any of the modes known to the law, if such testimony does not exceed probability. And in Arundel v. Turk, 16 Cal.App.2d 293, 60 P.2d 486, 487, 488, the rule is stated thus: 'Testimony which is inherently improbable may be disregarded, * * * but to warrant such action there must exist either a physical impossibility of the evidence being true, or its falsity must be apparent, without any resort to inferences or deductions.'" Pierstorff v. Gray's Auto Shop, 58 Idaho 438, at page 447, 74 P.2d 171, 175. First Trust & Savings Bank v. Randall, 59 Idaho 705, at page 715, 89 P.2d 741.

■ Ed. Morken's testimony with regard to the matter is merely to the effect that Henry never told him he owed Ellis any money or gave him the bonds in payment for a debt. This was purely negative and its weight is so slight as to be negligible. Kerby v. Oregon Short Line R. Co., 45 Idaho 636, at page 648, 264 P. 377; Karlen v. Trebble, Sheriff, 45 S.D. 570, 189 N.W. 519. This evidence did not amount to a contradiction of Miss Johnson and Mr. Trail. Idaho Mercantile Co. v. Kalanquin, 8 Idaho 101, 66 P. 933.

The bonds being in the box belonging to Mrs. Ellis Odberg, to which she alone had access, is analogous to bonds being in the purchaser's box, but marked for another. The court in Miller v. Silverman, 247 N.Y. 447, 160 N.E. 910, holding such circumstance to be evidence of transfer of title. In re Hurd's Estate, 162 Misc. 283, 294 N.Y.S. 273.

"Possession of personal property is prima facie evidence of ownership." Hare v. Young, 26 Idaho 691, at page 702, 146 P. 107, 109; American Fruit Growers, Inc., v. Walmstad, 44 Idaho 786, at page 791, 260 P. 168.

■ Since Henry Odberg had a lock box of his own in Genesee, five miles from where he lived, and Lyons testified he could not get into the box at the American Bank and Trust Company where these bonds were kept unless Mrs. Odberg was present, the box being in her name, it would not seem they were thus kept for his convenience. The circumstance that these bonds were kept in the lock box belonging to Mrs. Ellis Odberg and were not handled by Henry in the way he handled other bonds constituting in part his estate, thus predominates and persists. Henry was a man of perspicacity and amassing an estate of $160,000 (not all by dealing in bonds) would clearly indicate he had some skill in buying and selling bonds; therefore, it is impossible to avoid the conclusion he intended these particular bonds to be in a different category from his other bonds. Crediting the interest on the coupons to his (Henry's) account, did not abrogate the transaction as payment of a debt due Ellis from Henry by transferring the corpus of the bonds. Dill v. Dill et al., 118 N.J.Eq. 374, 179 A. 370; First Nat. Bank of Perth Amboy v. Keller, 122 N.J.Eq. 481, 194 A. 554.

While the above are gift cases and we recognize the difference between actions involving gifts and debts, they are sufficiently in point to sustain our position herein.

Goodrich Rubber Company bonds for $3,000 and a three-year certificate of deposit for $5,000 purchased by Henry to be delivered to Ellis, were not received by Ellis until after Henry's death and were not in the lock box with the $31,000 worth of bonds above noted and were not claimed by Ellis. This scrupulous declination, because of the dissimilarity of their posses-

sion, does not evince such inconsistent or contradictory conduct on the part of Ellis as to overthrow the claim for the $31,000.

 Ellis had and makes no claim against the estate and he had no basis for filing one, hence his failure to do so is of no consequence.

"If she became the owner of the debt, it never became a part of Kenton's estate and his administrator had no right to it nor to any part of it. Her suit against the bank was not merely on the check but on the assigned debt of the bank to Kenton. Kenton's debt to her had been satisfied by the assignment. She therefore, had no claim against Kenton's estate, and it was not necessary for her either to present a claim against the estate or to make the administrator a party to her suit against the bank." Dunlap v. Commercial Nat. Bank of Los Angeles, 50 Cal.App. 476, 195 P. 688, at page 690.

So far as material, it was incumbent upon the State to prove the payment by Henry or nonpayment by Ellis of income taxes on these bonds as the case might be, in support of its case. The failure to do so is, therefore, a defect in respondent's case —not appellant's.

Respondent not having sustained the burden of proof resting on it, the judgment cannot be sustained. Bussell v. Barry, 61 Idaho 216, 102 P.2d 276; In re Minor's Estate, supra.

The judgment, therefore, is reversed. No costs allowed.

BUDGE, C. J., HOLDEN, J., and SUTTON, D. J., concur.

MILLER, J., sat at the hearing but did not participate in the decision.