No. 27,626.

MOLLIE MADDEN et al., *Appellees*, v. MOLLIE GLATHART, *Appellant*,
ALICE MADDEN et al., *Appellees*.

(265 Pac. 42.)

SYLLABUS BY THE COURT.

1. WITNESSES — *Communications With Persons Since Deceased — Witness Not Taking Part in Communication or Transaction.* With reference to the competency of a witness as to transactions and communications had with a person since deceased where the witness does not take part in the transaction or communication, the approved theory is that competency is the rule and disqualification the exception, and where doubtful the statute should be construed in favor of admission rather than rejection of evidence.

2. DEEDS—*Delivery.* The undisputed facts in this case considered and held as a legal question not to constitute a sufficient delivery of the deed in question.

3. GIFTS—*Undue Influence—Independent Advice in Case of Fiduciary Relationship.* The presumption of undue influence in this case, on account of the fiduciary relationship of father and son and the entire failure to afford and show independent advice, justifies the court in holding the attempted conveyance to be invalid.

Appeal from Ellis district court; JACOB C. RUPPENTHAL, judge. Opinion filed March 10, 1928. Reversed.

*T. M. Lillard, Bruce Hurd, O. B. Eidson,* all of Topeka, *E. A. Rea* and *E. C. Flood,* both of Hays, for the appellant.

*Guy L. Hursh* and *Silas Porter,* both of Topeka, for the appellees.

The opinion of the court was delivered by

HUTCHISON, J.: This is an action involving the validity of a trust deed. It is brought by two of the three trustees named therein against the other trustee and the minor beneficiaries. The petition alleges that the other trustee refuses to recognize the trust and assume the duties as trustee, and asks that the interests of all the parties in the action in and to the property conveyed under the trust deed be fully determined and settled and a new trustee substituted and appointed for the one refusing to act or recognize the trust.

The answer of the defendant who is named as one of the trustees is a general denial, a specific denial of the execution and delivery of the deed, and, further, that if executed and delivered, it was procured by undue influence and without independent advice, through

Deeds, 18 C. J. pp. 215 n. 6, 438 n. 62. Gifts, 28 C. J. p. 654 n. 31; 12 R. C. L 953. Witnesses, 40 Cyc. p. 2328 n. 62; 29 L. R. A. n. s. 1181; 28 R. C. L. 499.

confidential or fiduciary relationship of father and son. The answer, by way of cross petition, brings in as a party the son of the grantor, and asks for partition of the property between him and the defendant named as a trustee—a daughter—in disregard of the trust deed. The trial court made findings of fact and conclusions of law and rendered judgment thereon upholding the trust deed as a valid instrument of conveyance. The defendant who was named as trustee appeals.

The grantor in the trust deed was E. F. Madden, who had been an unusually active and successful business man in Ellis county, being president of the First National Bank of Hays for a number of years, in the grain and real estate business, and the owner of a quantity of land in this and several other states. His wife died in 1913. He had two children, W. J. Madden, a son, who had been cashier of the same bank of which his father had been president and who had worked with his father in all his business affairs from early manhood, and a daughter, Mollie Glathart, who resided with her husband at Lawrence, Kan. When the wife of the grantor died in 1913, the father persuaded the daughter to move to Hays to keep house for him and look after the four children of the son, W. J. Madden, who had been making their home with their grandparents since 1910. She had no children.

E. F. Madden commenced to fail in health about the time of the death of his wife, and soon needed the constant care of a nurse, in addition to the care and attention regularly given him by his daughter, until his death on September 11, 1921. During this time he had some financial troubles, and, after working out of them with his son's help, he left nearly all business matters to his son and intrusted to his care substantially everything of a business nature. He was recognized as a man of unusual business ability and had accumulated a large estate at the time of his death at the age of about 74 years. The relations between him and his daughter had always been ideal —affectionate and perfectly congenial. She had cared for the four young children of her brother in her father's home during most of the eight years she had cared for her father, and looked after his home. During the last year or more of E. F. Madden's life, he was very weak physically and had to be helped to and from bed. He would sit up some during the day and occasionally take a short ride in an auto. Although physically weak, he was never incapacitated mentally. No one was permitted to visit him more than a few

minutes at a time. His son, W. J., generally called Bill, was about 50 years old at the time of his father's death, and the daughter, Mollie, was a few years younger. The two older children of W. J. Madden, Edward F. and Mollie, were near or about the age of 18 years at the time of their grandfather's death. Applications were made to have the district court of Ellis county confer the rights of majority upon them in July, 1921, and such orders were made in October, 1921, about one month after the death of the grandfather.

The trust deed in question, as introduced in evidence (now in the hands of this court, together with a number of other deeds introduced in evidence) was dated March 20, 1921. The grantees are Mollie Glathart, Edward Madden and Mollie Madden, as trustees for Mollie, Edward, Alice and Susan Madden; Mollie Glathart to have net one-half of the income from property conveyed during her lifetime. There was no consideration named in the deed. The description covers many town lots and thousands of acres of land in Kansas and other states; also all personal property of every kind, wherever located. It shows acknowledgment by W. J. Madden on March 20, 1921, and bears indorsement of being recorded February 9, 1922. It was not shown to Mollie Glathart by any one until the day it was recorded, when it was shown to her by her brother, W. J. Madden. Her father never told her of having executed such a deed; neither did either of the other two trustees ever mention the existence of the deed to her prior to the time it was shown her. Her brother never offered to turn over the property to her. The deed contains by description property conveyed to her by her father many years before, called the home property, and also a lot conveyed to Leon Akers by deed dated the same day. No change was made in the way or manner of handling the property, disposing of the income or profits, or meeting the expenses during the life of E. F. Madden between the date of this deed and his death, which was nearly six months, nor prior to the time it was shown to Mollie Glathart, which was nearly five months more. The above statement contains nothing but undisputed facts, and, of course, not all of those.

The evidence as to the execution, acknowledgment and delivery of the deed was furnished by W. J. Madden, the son, and Edward, the 18-year-old grandson. Edward testified as to the conversation between his father and grandfather, in which he, Edward, did not participate. He states that his father told the grandfather he had the

deed for him to sign, and the grandfather took it, read it and signed it in his presence, after asking if the majority papers had been procured, to which his father answered in the affirmative. His father then suggested getting a certain notary, but the grandfather said, "No, Bill, acknowledge it yourself." He said they remained there about one hour and no other person was present, not even the nurse. They both testified that W. J. prepared the deed that afternoon on the typewriter in the office before going to the home, and, upon returning to the office, signed it as notary, affixed his seal, and gave it to Edward, who put it in his father's safe.

The evidence is somewhat conflicting upon several matters more or less closely connected with the matters involved in this case and the circumstances naturally surrounding them, but we shall not attempt to go into these controversies and differences, but will try to determine what conclusions can properly be reached from those undisputed facts in connection with the presumptions and inferences that always belong in a case of this kind and character. A preliminary question is presented and urged by the appellant as to the competency of two witnesses to testify as to transactions and communications had with a person now deceased. As to the witness W. J. Madden, it is not directly urged that he comes within the inhibition of the statute, but more particularly that he is a party in the case and greatly interested, although indirectly. This may more properly be considered in connection with the question of credibility rather than incompetency. The witness Edward Madden is the one especially complained of in this connection. Reference is made by appellant to some early Kansas decisions, and one in particular, where the usual interpretation of the law would have permitted two witnesses in conversation with the person since deceased to have each testified as to the conversation of the party since deceased with the other witness. Whatever divergence there may be said to be in the decisions on this question, it is certain that in Kansas, at least, there is not much room for debate on the subject, since the decision in the case of *Robertson v. Wangler*, 107 Kan. 45, 190 Pac. 788, where it was said in the opinion:

"In view of the policy of the court to resolve doubts in favor of the admission of evidence, the theory of the Wills-Wood case is to be pressed no further than the line there drawn. A witness may testify to transactions had by others with persons since deceased, although the circumstances were such as to have disqualified him if he had taken part in them." (p. 51.)

Prior to that decision, our court had frequently expressed itself in favor of the theory that competency is the rule and disqualification the exception, and that where doubtful the statute should be construed in favor of admission rather than rejection of the evidence. (*Williams v. Campbell*, 84 Kan. 46, 113 Pac. 800; *Sarbach v. Sarbach*, 86 Kan. 894, 122 Pac. 1052; *Armstrong v. Street Railway Co.*, 93 Kan. 493, 144 Pac. 847; *Cadwalader v. Pyle*, 95 Kan. 337, 148 Pac. 655; *Bank v. Abbott*, 104 Kan. 344, 179 Pac. 326; *Gaston v. Clabaugh*, 106 Kan. 160, 186 Pac. 1023.) This witness did not take part in the transactions or communications about which he testified. He was present, and simply testified as to what he saw and heard. Under the most approved rules on the subject he was not disqualified to testify to such matters, and his testimony was competent.

The trial court found, both as a fact and a conclusion of law, that the deed in question was a valid and legal instrument of conveyance. A manual delivery is an evidentiary fact, but the delivery necessary to make an instrument valid is an ultimate fact and involves the legal question of intent as well as manual delivery. It is first a question of fact and then a question of law.

"'What constitutes a sufficient delivery of a deed is largely a matter of intention, and the usual test is, Did the grantor by his acts or words, or both, manifest an intention to make the instrument his deed, and thereby divest himself of title?' (*Wuester v. Folin*, 60 Kan. 334, 56 Pac. 490.)" (*Doty v. Barker*, 78 Kan. 636, syl. ¶ 1, 97 Pac. 964.)

We have the undisputed facts in this case, including the manual delivery, and are able to associate with that all such facts and circumstances in order to learn the intent of the grantor; besides, we have now in our possession the original deed and other deeds introduced in evidence in this case and can at first hand form a conclusion and opinion from them. The deed is on a blank now quite faded and discolored, and is quite different in appearance from that of the Akers deed, dated the same day and recorded the next day. The signatures of the grantor on the two deeds are somewhat different in appearance, and the color of the ink used for the signatures of the grantor, as well as those of the notary, is noticeably different in these two deeds. There is no reservation in the deed about its being delivered or becoming effective after the death of the grantor. It completely stripped him of everything he had, both real and personal property, the day it was delivered, if delivered.

Madden v. Glathart.

It is admitted he was a very fine business man and retained his mental faculties until the last, even after his physical strength was nearly all gone. What about the funds and income to meet the very heavy expense for the day after the deed was made and for the nearly six months thereafter before his death? Are we to say that E. F. Madden, the fine business man and banker, intended on March 20, 1921, to deprive himself of every dollar he had in the world and leave himself without any means of meeting his daily expense? It is said it was a matter of peace and harmony at home that might have prompted a delay of effective delivery. Then, it would be in effect a will and not a deed, because there is no pretense of any consideration. It was a gift, if anything. Consider the many suspicious circumstances surrounding this attempted conveyance. It was prepared by one who manifestly had very litle experience in the mechanical part of typewriting and evidently less about the legal forms and manner of execution. It was signed and acknowledged on Sunday. There were no witnesses. It included property already conveyed and being that day conveyed. It was handed to a minor, for whom an application to have majority conferred was made four months later, and an order made seven months later. It is hard to conceive of any one, so trusted with such an important duty, as we are told this son and this grandson were, and knowing the intention was for an immediate delivery and transfer of so large an amount of property, breaching and betraying that trust and concealing it from the world and those most interested in it—particularly from the only adult trustee named therein—for nearly a year after the time intended by the donor that it should be effective. Or, if it was not intended by the grantor to be delivered until after his death, then we should apply the rules for a devise or bequest, under which rules it would be harder still to call what was done in this case to be all that is required for a legal delivery of a deed.

"It is clear, if that were Mr. Hoard's intention, he did not intend for the grantees named therein to have any title or interest in the property until his death. If this was a gift it was testamentary in its nature—that is, not to take effect until death—and not being executed as provided by the statute for the execution of wills, cannot be effective to pass title to the grantees named." (*Hoard v. Jones,* 119 Kan. 138, 162, 237 Pac. 888.)

"The question of the delivery of a deed is largely a question of intention, ordinarily to be determined by the jury or trial court as a question of fact, but when the facts are not controverted the question should be determined by the court as a question of law, and when the facts have been fully tried, leav-

ing only questions of law to be decided, this court may direct the entry of a proper judgment—following *Worth v. Butler,* 83 Kan. 513, 112 Pac. 111." (*Hoard v. Jones,* supra, syl. ¶ 9.)

It is expecting of any court a very great deal to conclude that the intention of the grantor in this case was for an immediate delivery of the deed when the only two living witnesses on the subject ignored in every way a compliance therewith for nearly a year. The court concludes from the undisputed evidence and evidence at first hand that there was no legal delivery of the deed in this case.

The trial court in his conclusions of law uses an expression which might be thought to mean that defendant had failed to prove or show undue influence. Later in the conclusions the expression is broader. It was not necessary for the defendant to show or prove undue influence. The relation of the parties places the burden upon the plaintiff to show and prove there was no undue influence.

"The confidential relations existing between the appellant and his mother having been clearly established, a presumption arose of undue influence, and the burden rested upon him to show that the transaction was free from such influence. In addition to the presumption which in equity arises from the situation of the parties and their relations to each other, the circumstances under which the conveyances were obtained are suggestive of unfairness on the part of the appellant amounting to undue influence. The fact that he initiated the proceedings, directed the preparation of the deeds, arranged for their execution, selected the witnesses to be present, and that none of the other members of the family was informed of the transactions, were circumstances hardly to be overcome by his denial of undue influence and the testimony of witnesses that the grantor appeared to understand what she was doing." (*Smith v. Smith,* 84 Kan. 242, 247, 114 Pac. 245.)

"In such a case as this, the burden of establishing the perfect fairness and equity of the conveyance to Mrs. Paddock was thrown upon her, in view of her father's age, sickness and feebleness of mind, and the close relation of the parties." (*Paddock v. Pulsifer,* 43 Kan. 718, 721, 23 Pac. 1049.)

"Rule followed that persons enjoying a confidential relationship with the grantor of gifts *inter vivos* have the burden of showing that such gifts were made without undue influence." (*Coblentz v. Putifer,* 97 Kan. 679, syl. ¶ 1, 156 Pac. 700.)

"Viewed as gifts *inter vivos,* the burden was on Peter, owing to his confidential relationship, to show that he did not obtain them through undue influence, and he failed to sustain that burden." (*Hoff v. Hoff,* 106 Kan. 542, 550, 189 Pac. 613.)

It makes no difference that the one in the confidential relationship with the grantor is not a beneficiary himself. If the beneficiaries are his children, or even if the benefit is for some worthy

cause which he is anxious to help, the rule is the same. (*Cornet v. Cornet,* 248 Mo. 184, 234; *Good v. Zook,* 116 Ia. 582.) This subject will be further considered in connection with the concluding one of this opinion, viz., the necessity of independent advice and counsel where fiduciary relationship exists.

We have a statutory requirement in Kansas for independent advice in relation to wills where fiduciary relationship exists. As stated before, this looks more like a will than a deed when we observe the attitude of the only parties who knew of its execution or existence. Even now there are no suggestions as to the proper use of the income and the return of expenses incurred and paid between the date of the deed and the death of the donor. So, why should the instrument, treated as if a will by those who held it, not be surrounded with the protection afforded and required by statute if it were a will? Our own court in a will case has treated this question as a general principle of protection necessary with, or even without, such a statute.

"There has long been a principle recognized by courts of equity pertaining to gifts during life, where the donor gave all, or the principal part, of his property to one who stood in a confidential relation to him, which principle required the donee in such an instance to show not only that the donation was knowingly made, but that the donor had independent advice pertaining thereto. (See 28 C. J. 654, and cases there cited; also, *Nobles v. Hutton,* 7 Cal. App. 14; *Flowers v. Flowers,* 94 Okla. 134; *Pruitt v. Gause,* 193 Ia. 1354.) Our legislature has written this principle into the law of wills. In *Post v. Hagan,* 71 N. J. Eq. 234, the term 'independent advice' in this connection was held to mean 'that the donor had the preliminary benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was, furthermore, so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidentially as to the consequences to himself of his proposed benefaction.'" (*Flintjer v. Rehm,* 120 Kan. 13, 17, 241 Pac. 1087.)

The language of the Corpus Juris citation given in the above quotation is as follows:

"In some jurisdictions, where a confidential relation exists between the donor and the donee, the validity of a gift depends upon whether or not the donor had independent advice. And, even where this rule is not recognized as controlling, it has been held that the question whether or not the donor received independent advice is a material one to be considered with other surrounding facts and circumstances, such as the nature and purpose of the gift, and the condition and relation of the parties." (28 C. J. 654.)

"The normal relation of parent and child, as it had existed in earlier years, had been reversed, and the daughter had become the guardian of the father. In this situation the law presumes that a gift made by the parent to the child

is the product of undue influence, and casts upon the latter the burden of proving the contrary. It was considered by the vice chancellor, before whom the case was tried, that she had discharged this burden. After a careful review of the testimony we are not one as to the soundness of this conclusion. A decision upon this point in the case, however, is rendered unnecessary, as we conclude that the conveyance must be set aside, because, in making it, the donor did not have the benefit of competent and independent advice as to its effect.

"That the absence of such advice will invalidate a deed of gift, which contains no power of revocation, where a relation of trust and confidence exists between the donor and donee, is not denied, and, indeed, it was so held by the vice chancellor. He seems to have considered, however, that such relationship was not shown, unless it was made to appear that the donee occupied such a dominant position toward the donor as to raise the presumption that the latter was without power to assert his will in opposition to that of the donee. But this is not the situation. The rule has a much broader sweep. Its purpose is not so much to afford protection to the donor against the consequences of undue influence exercised over him by the donee as it is to afford him protection against the consequences of voluntary action on his part, induced by the existence of the relationship between them, the effect of which, upon his own interests, he may only partially understand or appreciate." (*Slack v. Rees,* 66 N. J. Eq. 447, 448.)

"There is no pretense, even by the defendant, that the old gentleman had the opportunity or advantage of independent advice from any source, and this fact alone has often been held sufficient to set aside deeds and contracts obtained under such conditions." (*Pruitt v. Gause,* 193 Ia. 1354, 1359.)

Again, our own court has referred to and applied these principles to a donation in the form of a deed in the case of *Barger v. French,* 122 Kan. 607, 230 Pac. 253.

"The real question in the case, under the pleadings, is whether a valid gift was made. This depends upon the issues joined as to Mrs. Denning's mental capacity to comprehend the nature of the transaction, and the allegations as to the conduct of Rev. Mr. Smith, and others representing the church organization, amounting to fraud and undue influence. This should be determined by the evidence pertaining thereto and in accordance with the principles of courts of equity in dealing with such questions. The fact that Rev. Mr. Smith, and those associated with him, were ambitious to get Mrs. Denning's property, or the value of it, to use for religious purposes, if that is shown to be a fact, would not justify them in overreaching her, or taking advantage of her, if the evidence discloses such was done. If the evidence warrants it, there should be a judicious application of the principle of independent advice recognized by courts of equity, and which our legislature has written into the law of wills. (R. S. 22-214; *Flintjer v. Rehm,* 120 Kan. 13, 241 Pac. 1087, and cases there cited.) We are not expressing a view as to the evidence, or the weight of the evidence, upon this question; we carefully avoid doing so; that is a question for the trial court. We are simply endeavoring to point out the question upon which the case must turn, viz., Was there

a gift (conditional or otherwise) of the property in question, intelligently and freely made? and to point out the legal principles to be applied, viz., the principles usually applied by courts of equity in such controversies." (p. 612.)

We think the facts in the case at bar much stronger for the application of this wholesome rule than those in the case just cited, and they should be applied here. It is not claimed there was any independent advice here; in fact, all the evidence concerning the making and delivery of the deed shows there could not have been any such advice. The record shows that attorney and bankers were on hand a few years earlier, when there was something doing in financial and business matters, but when the deed was drawn up they did not seem to have been wanted or needed. Again we refer to the language and facts in the case of *Smith v. Smith,* above quoted, showing presumption of undue influence because of the relation of parent and child and the need of independent advice, and because of an entire lack of such advice conclude that this attempted conveyance should not stand as valid and legal.

The judgment of the trial court is reversed and the cause remanded, with instructions that further proceedings be in accordance with the views herein expressed.

BURCH, MARSHALL AND HUTCHISON, JJ., dissenting.