No. 30,058.

Carrie Schultz, *Appellee*, v. The United Telephone Company, *Appellant.*

(3 P. 2d 506.)

Opinion filed October 10, 1931.

*C. W. Burch, B. I. Litowich* and *LaRue Royce,* all of Salina, for the appellant.

*Z. C. Millikin,* of Salina, for the appellee.

The opinion of the court was delivered by

Dawson, J.: This was an action for conversion of twelve shares of telephone stock to which plaintiff laid claim of ownership by virtue

of an alleged gift *inter vivos* from her aunt, in whose name the stock had been issued by the defendant company.

The circumstances were as follows: The late Elizabeth Schindler, of Saline county, and her husband, Henry Schindler, were married in 1898. They had no children. She was a business woman, and through her labors in operating a boarding house she accumulated some property. According to plaintiff's evidence the husband was rather lacking in enterprise and inclined to let his wife earn the living. He had the habit of coming to her for money, and was somewhat disposed to pay attention to other women. The plaintiff, Carrie Schultz, was the niece of Elizabeth, being a daughter of Elizabeth's brother. Plaintiff's mother had been an invalid for years, which fact limited plaintiff's opportunities considerably, and this situation incited the solicitude of her aunt, Mrs. Schindler. In 1926 Mrs. Schindler was the owner of twelve shares of stock in the defendant telephone company. One Sunday in the spring of that year Mrs. Schindler, who lived in Salina, came to the Schultz farm home, about four miles from the city. She carried with her that telephone stock. She departed that evening without it. It was then in the possession of Carrie. Elizabeth had not theretofore put any of her property in Carrie's keeping. She did not ask. Carrie to hold the stock for her, nor did Carrie steal it. Next day Carrie took the stock to Salina and put it in a safety deposit box, where it remained under her control until after her aunt's death intestate on April 2, 1928. Two weeks later plaintiff, through her attorney, notified the defendant telephone company of her claim of ownership of the stock, as follows:

"*United Telephone Company, Abilene, Kan.:*     APRIL 16, 1928.

"GENTLEMEN—This is to advise that your certificates of preferred stock No. 6370 and 7208 issued to Mrs. Elizabeth Schindler are owned by Miss Schultz, living near Salina, and any future dividends on this stock will be payable to her.     Yours truly,     Z. C. MILLIKIN."

The defendant company acknowledged receipt of this letter two days later, April 18, 1928, stating, among other matters, that before dividends could be issued to Miss Schultz it would be necessary that the certificates be indorsed by Mrs. Schindler, and that they be mailed to the company for transfer. Defendant's letter concluded with an assurance of its earnest coöperation in the matter.

However, on April 30, 1928, Henry Schindler, surviving husband and sole heir of Elizabeth, was appointed administrator and without taking oath or giving bond, he procured a summary order of the

probate court directing him as administrator to cause the telephone stock to be transferred to himself individually. At its beginning this order recites that the proceeding was had on April 30, 1928, but at its conclusion it recites:

"Done in the probate court aforesaid this *12th* day of April, 1928.

"WILL F. MILLER, *Probate Judge.*"

On April 30, 1928, Henry Schindler made an affidavit in which he averred that the only personal property of the late Elizabeth *that had come into his possession* as administrator was the twelve shares of telephone stock, but that he had made a thorough search and was unable to locate the certificates, and that to the best of his belief they were lost. On May 5, 1928, defendant issued new certificates of stock to Henry Schindler, thus canceling the ones held by plaintiff. The following day, May 6, 1928, Schindler sold the newly issued stock to Fred H. Quincy for $1,200.

Some time later correspondence between plaintiff's attorney and the defendant company concerning plaintiff's claim of ownership of the Elizabeth Schindler stock was renewed; but although plaintiff offered to put up a bond to protect defendant, the latter could not then recognize plaintiff's rights in the stock, since it had reissued it to Henry Schindler and had recognized the rights of Quincy as latest transferee.

Hence this lawsuit for conversion of the stock.

Defendant's demurrer to the petition was overruled, and it then answered pleading the facts. Plaintiff's reply alleged that she had not been apprised of the probate court proceedings and that they were had without notice, and that the probate court had no jurisdiction to determine between herself and Henry Schindler the ownership of the stock. She further alleged that prior to the order of the probate court defendant had notice of plaintiff's ownership of the stock.

The cause was tried before a jury. On the assumption that the gift of the stock, if there was such a gift, was a transaction between plaintiff and her deceased aunt, and that her capacity to testify to the facts was therefore much restricted, plaintiff was not permitted to testify to the ultimate fact of the gift; and the competency of what testimony she did give is stoutly challenged in this appeal. Plaintiff's father testified that about a year after the stock had come into plaintiff's possession he had a conversation with his sister Elizabeth in which she asked him if he knew where Carrie kept

that telephone stock that she (Elizabeth) had given her, and he had replied that it was in a safety deposit box in the Farmers National Bank in Salina. Elizabeth said that was a good place for it, and .that she was to draw the dividends herself as long as she lived; but she added that the stock might do the Schultz family "some good some day."

There was testimony in behalf of defendant that plaintiff had not been quite frank with Henry Schindler when he was inquiring about the whereabouts of the stock shortly after Mrs. Schindler's death. Plaintiff's reticence on that matter was accounted for in part by her youth and inexperience, and also because her aunt had told her not to tell Mr. Schindler "because they had family difficulties and that would be worse." Instead Carrie placed the stock in her attorney's hands and he promptly notified defendant, as set forth above.

The jury returned a verdict for plaintiff for $1,200 as the value of the stock, and answered many special questions consistently with the verdict. Some of these read:

"1. Q. Did Elizabeth Schindler in the year 1926 deliver the twelve shares of telephone stock mentioned in the petition to the plaintiff, Carrie Schultz? A. Yes.

"3. Q. Had the shares of stock mentioned in the petition been in the plaintiff's possession and under her control from the summer of 1926? A. Yes.

"5. Q. Did the plaintiff, after the death of Elizabeth Schindler and on or about April 16, 1928, cause her attorney to notify the defendant by letter that she claimed to be the owner of the shares of stock mentioned in the petition? A. Yes.

"6. Q. Did the defendant on May 5, 1928, without the consent or knowledge of the plaintiff, transfer said shares of stock to Henry Schindler? A. Yes.

"9. Q. Did Mrs. Schindler intend to make a gift of her stock, evidenced by certificates numbered 6370 and 7208, to the plaintiff? A. Yes.

"10. Q. If you answer the last question, was the gift to take effect after the death of Mrs. Schindler? A. No. Gift was made in 1926, Mrs. Schindler reserving the dividends until death.

"21. Q. Did the statements, acts and conduct of the plaintiff, directly or indirectly, induce and cause the defendant company to issue new certificate of stock in lieu of certificates numbered 6370 and 7208? A. No."

Judgment was entered accordingly, and defendant assigns various errors which will be considered in the order in which they appear in its brief.

The first contention is that there was no competent evidence to prove the gift of the stock. The main features of that evidence were as summarized above—the Sunday visit of Elizabeth to the Schultz home in 1926, at which time she carried the stock with her; Eliza-

beth's departure that evening without the stock; the niece's resultant possession of it for the next two years; Elizabeth's conversation with her brother a year later when she inquired as to the whereabouts of the stock which she had given to Carrie; and Carrie's testimony that theretofore she had never taken into her custody any property for her aunt, that she was not asked to do so in that instance, and that she did not steal the stock.

Part of plaintiff's testimony reads:

"Q. Where was this envelope, marked plaintiff's exhibit one, the first time you saw it? A. It was in my aunt's hands at my home.

"Q. Was there anything inside of it at that time? A. Two stock certificates, one for $1,100 and one for $100, from the United Telephone Company.

"Q. I show you stock certificates marked plaintiff's exhibit two and three, and I will ask you to state if they were the certificates that you say were in the envelope when you first saw it in your aunt's hands? A. They are.

"Q. Where were these certificates when your aunt left your home? They were in my possession. In my cedar chest.

"Q. Who put them in your cedar chest? A. I did.

"Q. And where was it? A. In my home in my bedroom.

"Q. Where was your aunt when you put them in the cedar chest? A. She was there.

"Q. Where? A. In the same room with me. She saw me put them in there.

"Q. Did you put the certificates in your cedar chest within her sight? A. Yes, I did.

"Q. You say you put them in the cedar chest while she was there; how long did they remain in your cedar chest? A. Over night. The next day my father and I took them to the Farmers National Bank and put them in the safety deposit box."

Other evidential incidents of some probative value were the aunt's and niece's attachment toward each other; the aunt's concern for the niece because the latter had been tied down at home during her girlhood for eight years caring for an invalid mother; the evidence that Elizabeth's husband was somewhat indolent and inclined to sponge on his wife and waste his time on other women, and that Elizabeth was going to leave him in comparatively easy circumstances anyway. When the telephone stock was left with Carrie in 1926 the aunt believed herself to be afflicted by incipient cancer. On her deathbed she told her husband where he could find her diamond ring, but said nothing to him about the whereabouts of the telephone stock, which was some indication that she had already parted with it.

The competency of much of the evidence outlined above is vigorously denied, and the pertinent statute as well as cases from our own reports are pressed upon our attention to demonstrate its inadmissibility. The statute, in part, reads:

"No person shall be allowed to testify in his own behalf in respect to any transaction or communication had personally by such party with a deceased person, where either party to the action claims to have acquired title, directly or indirectly, from such deceased person, or when the adverse party is the executor, administrator, heir at law, next of kin, surviving partner, or assignee of such deceased person, . . ." (R. S. 60-2804.)

Does this statute disqualify a litigant in every sort of case from giving parol evidence of his acquisition of title to a chattel by a gift *inter vivos* from a person since deceased? If a father should give his son a watch, a gun, or an automobile, and some wrongdoer who was a stranger to the father's estate should deprive him of the gift after the father's death, must the son lose his action for conversion of the chattel because he has no other evidence to prove his title than his own testimony, which in turn is rendered inadmissible under the statute? That, in our opinion, is not the purpose of the statute at all. This statute is only concerned with the situation which arises when one of the litigants has to make proof of a transaction between himself and a deceased person in a lawsuit where the subject matter of the transaction is in issue and where the adverse party is the executor, administrator, heir at law, next of kin, surviving partner or assignee of such deceased person. If the statute had been designed to favor strangers to the estate, what purpose was to be subserved by specifying the particular classes of adverse litigants against whom no testimony in respect to transactions with the deceased could be given? If such was the ligislative intent it would have been much clearer as well as more certain if the statute had said that in all cases whatsoever and between all litigants whomsoever no testimony of any party to a transaction shall be received in evidence concerning it where the other party to the transaction has since died.

An examination of the Kansas cases cited by appellant reveals that in every instance where the testimony of the witness was excluded under this statutory disqualification the adverse party was one of the specified classes against whom the testimony was offered. Thus in *Wills v. Wood,* 28 Kan. 400, the rejected testimony had been offered in an action against the administratrix and heirs of David E.

James. In *Clifton v. Meuser,* 79 Kan. 655, 100 Pac. 645, the adverse party protected by the statute was the executor of the deceased person with whom the plaintiff had the transaction. In *Plowman v. Nicholson,* 81 Kan. 210, 105 Pac. 692, the adverse parties were heirs of deceased persons with whom the transactions were had and about which the litigation was concerned. In *Bryan v. Palmer,* 83 Kan. 298, 111 Pac. 443, the proffered testimony was given in an action where the administrator of the deceased person was the adverse party. In *Klein v. Blackshire,* 113 Kan. 539, 215 Pac. 315, the litigation was between heirs at law of the deceased—one his widow, the other his daughter. In *Beebee v. Peterson,* 130 Kan. 14, 285 Pac. 616, the action was by the administrator of the estate of Andrew Beebee against his sister and coheir for an accounting and recovery of property which defendant claimed as a gift *causa mortis* from the deceased intestate.

We have not limited our examination of the Kansas cases to those cited by appellant; but a painstaking search of our reports reveals no case where the statute was effectively invoked to bar a litigant from testifying to a transaction with a deceased person where the adverse party was neither an executor, administrator, heir at law, next of kin, surviving partner, nor assignee of such deceased person. On the contrary, in *Reville v. Dubach,* 60 Kan. 572, 57 Pac. 522, it was expressly ruled that a party to an action may testify in respect to transactions or communications had by him with a deceased person, where the adverse party was not the executor, administrator, heir at law, next of kin, surviving partner or assignee of such deceased person.

See, also, *Stewart v. Falkenberg,* 82 Kan. 576, 109 Pac. 170; *Savage v. Modern Woodmen,* 84 Kan. 63, 113 Pac. 802; *Sarbach v. Sarbach,* 86 Kan. 894, 122 Pac. 1052; *Kansas City Life Ins. Co. v. Wilkinson,* 125 Kan. 305, 307, 264 Pac. 37; *Beeler v. Motter,* 33 Fed. (2d) 788; *Haffner v. Van Blarcom,* 84 Colo. 565; 28 R. C. L. 495 *et seq.;* 40 Cyc. 2301 *et seq.*

The section of the code which we have been considering (G. S. 1868, ch. 80, § 322) was the subject of legislative revision in Laws of 1909, ch. 182, § 320, and Laws of 1911, ch. 229, § 1, but obviously the point of present concern was not affected thereby.

Touching the sufficiency of the evidence summarized as above, while appellant is quite correct in its contention that plaintiff's

possession of the stock was not sufficient in itself to prove plaintiff's ownership of it nor the gift of it from her aunt (*Beebee v. Peterson,* 130 Kan. 14, 285 Pac. 616) yet the fact of its possession for two years is a probative fact (*O'Keefe v. National Bank,* 49 Kan. 347, 30 Pac. 473) the evidential potency of which depends upon the attendant circumstances. Even in cases which fall strictly within the bar of the statute (Civ. Code, § 320, R. S. 60-2804) it has been held that where the civil code forbids parol evidence of transactions with deceased persons proof of such transactions need not fail, but may be established by circumstantial or other competent evidence. (*Davis v. Sim,* 100 Kan. 66, 163 Pac. 622.)

Appellant directs our attention to *Nash v. Harrington,* 110 Kan. 636, 205 Pac. 354; *Rayl v. Central Trust Co.,* 127 Kan. 131, 272 Pac. 147; and *Countryman v. Merwin,* 129 Kan. 317, 282 Pac. 724. We have not the slightest disposition to minimize anything said in those cases, but they were cases involving *land* where the transfer of title *ought* to be in writing and where only the flimsiest of parol evidence was adduced to establish title by gift in the face of the statute of frauds. We do not have that precise problem to deal with in the gift of a chattel.

The court holds that the evidence inherent in the circumstances, together with plaintiff's testimony and the corroborating testimony of her father in which he narrated the conversation he had with his sister a year after the stock came into his daughter's possession, satisfied the rule applied in *Ariett v. Osage County Bank,* 120 Kan. 286, 242 Pac. 1018, and cases there cited, which declares that a gift *inter vivos* must be proved by clear and convincing evidence, since the general verdict and special findings make it apparent that the jury and the trial court gave that evidence their unqualified credence. (*Bryant v. Bartelli,* 118 Kan. 75, 233 Pac. 1035; *Nestlerode v. Commercial Nat'l Bank,* 121 Kan. 399, 401, 402, 247 Pac. 866.)

Other matters urged in appellant's brief have been duly noted but require little discussion. Defendant pleaded an estoppel, but that issue was not developed by evidence which would require the court to deal with it in the instructions. The stock certificates contained a recital that it was transferable only upon the surrender of the certificates properly indorsed. Defendant had timely notification of plaintiff's claim of ownership shortly after Mrs. Schindler's death, but despite that notification and despite its assurance of earnest co-

operation with plaintiff's attorney in the matter of getting the record title to the stock transferred to plaintiff on the books of the company, within two weeks thereafter it made common cause with Henry Schindler to render nugatory plaintiff's claim of ownership, and did so, moreover, without letting her know what was going on to her disadvantage. We are not asked to rule upon the point whether a gift of unindorsed corporate stock is valid, but see *Plumb v. Bank of Enterprise,* 48 Kan. 484, 29 Pac. 699, 28 C. J. 658, nor on the question whether a corporation is liable where it makes a transfer of stock without surrender of the outstanding certificates.

The record contains no error, and the judgment is affirmed.

BURCH, J., not sitting.