No. 32,470

HARRY GILLIHAN, *Appellee*, v. ECONOMY OIL COMPANY and C. E. HOSE, *Appellants*.

(54 P. 2d 957)

Opinion filed March 7, 1936.

*S. D. Scott,* of Olathe, and *Henry W. Buck,* of Kansas City, Mo., for the appellants.

*Howard E. Payne,* of Olathe, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: Plaintiff, employed by defendant to operate its gasoline filling station, sued his employer to recover moneys he alleged he was compelled to pay, or which were deducted from his salary or commissions because of leakage alleged to have been caused by a defective gasoline pump. A jury trial resulted in a judgment for plaintiff for $1,441.67, with interest since August 1, 1933. Defendant has appealed.

The facts may be briefly stated as follows: The defendant, C. E. Hose, a resident of Kansas City, Mo., doing business as the Economy Oil Company, owned and operated gasoline filling stations in Kansas. For about two years plaintiff was employed as filling-station attendant by defendant at its station on Southwest boulevard, and then was placed in charge of defendant's station at Merriam, Kan., where he was an attendant for a little more than three years. He went to the Merriam station May 1, 1930, and for the first two years was paid a salary of $140 per month. Thereafter his compensation was figured on a commission basis. Defendant owned the station and all the equipment, and it was his duty to keep the same in repair. Defendant also owned all the merchandise sold at the station. Defendant had as his general manager and superintendent one C. H. Vinson, who came to the station once or twice a week and checked the sales and merchandise on hand, at which time plaintiff was required to account for gasoline or other merchandise sold and to pay for any difference in quantities not so accounted for. Soon after plaintiff went to work at the Merriam station there was found to be a shortage of gasoline on hand, figured from the previous check-up, the amounts delivered in the meantime, and the amounts sold. This shortage was charged to plaintiff as against his salary or commissions. He complained of that and said there must be some leakage in the tanks or pumps. In installing the station defendant had purchased what he thought was first-class equipment from standard manufacturers and had it installed by competent workmen, and thought there was nothing wrong with it, and that there was no leakage coming from equipment; and perhaps thought plaintiff was not keeping as close record as he should of sales of gasoline,

although this was not clearly contended at the trial. Plaintiff was allowed $35 a month to employ an assistant, or a night man. Apparently it was suspected that some of this loss occurred when the night man was on duty, for five different night men, employed for a time, later were discharged. Plaintiff kept talking about this leakage and demurring to being charged with it, and wanted to dig out the tanks or pumps to see if any leakage could be found. Most of these complaints were made to Vinson, who ordinarily checked the station, but some of them were made to the defendant Hose, who sometimes checked it personally. He was told not to dig up the tanks or pumps, and that if he didn't quit talking about leakage he would be "fired." At one time Vinson did discharge him, but before the date set for his checking out he was told he might continue. There was visible evidence of leakage from the pumps or tanks in that the ground near them was saturated with gasoline. Eventually plaintiff did dig around one of the tanks to see if he could find a leak, but was unable to find it. In August, 1933, defendant dug, or permitted plaintiff to dig, about one of the pumps and found a tap at the bottom of the pump which apparently had never fitted properly and from which gasoline was leaking. This was repaired and there was no leakage after that time. Not long thereafter plaintiff asked defendant to reimburse him for the sums which he had been required to pay for leakage. Defendant declined to do so; hence this lawsuit.

In his answer defendant denied liability and pleaded a settlement in August, 1933, and also set up a counterclaim for $353.02, claimed to be due from plaintiff when he quit work December 4, 1933, and also alleged if there was any shortage it was due to plaintiff's negligence.

Turning now to the legal questions argued. Appellant contends the court erred in permitting plaintiff to testify to the conversations he had with Vinson, who died prior to the trial. It is contended plaintiff was an incompetent witness to such conversation under our statute (R. S. 60-2804), the pertinent part of which, as pointed out by appellant, reads:

"No person shall be allowed to testify in his own behalf in respect to any transaction or communication had personally by such party with a deceased person, where either party to the action claims to have acquired title, directly or indirectly from such deceased person."

The point is not well taken. Plaintiff did not claim to have ac-

quired title to anything from Vinson; his claim is against defendant Hose. Plaintiff and Vinson were employees of Hose, in different capacities. Competency is the rule; incompetency the exception. (*Madden v. Glathart*, 125 Kan. 466, 470, 265 Pac. 42.) The statute is for the protection of persons adversely interested in the estate of such a deceased person. (*Schultz v. United Telephone Co.*, 133 Kan. 730, 3 P. 2d 506.) Neither the plaintiff nor the defendant in this case was interested in the estate of Vinson; the litigation is not concerned with that estate, or any claim against it.

Appellant next complains of two instructions given by the court pertaining to negligence of plaintiff, if found, which would defeat his recovery. We have examined these instructions and find nothing seriously wrong with them. They correctly state well-recognized rules of law applicable to the question treated. Appellant's complaint is that their wording should have been modified so as to make them more specifically applicable to the facts of the case. Perhaps some modification of the wording would have been appropriate, but defendant should have called the court's attention to that when the instructions were given, and suggested appropriate modifications. That is the time it is important to have instructions properly phrased. Defendant did not do that, nor did he call the trial court's attention to the matter at any time. It is too late to do it here. When an instruction given is accurate as far as it goes, and is defective only in its wording, as applied to the facts of the case, a party must make his objections and suggestions promptly, or they will be unavailing. (*Master Sales Company v. Sytsma*, 114 Kan. 120, 122, 217 Pac. 291; *Foley v. Crawford*, 125 Kan. 252, 262, 264 Pac. 59.)

Appellant next contends the evidence is insufficient to support the verdict, and that the verdict is against the weight of the evidence. The record contains an abundance of evidence to support the verdict. No good purpose would be served by detailing this evidence. The weight to be given the evidence was for the jury and the trial court.

Appellant next contends the verdict shows on its face the jury did not properly consider the evidence; that the verdict does not accord with the instructions of the court, and that the court erred in receiving the verdict, rendering judgment thereon, and in overruling a motion for a new trial. We have carefully examined all that is said on these points and find none of them to be well taken.

The judgment of the trial court is affirmed.