No. 31,274

DONALD H. CORSON, Administrator of the Estate of Fred C. Oakley, Deceased, *Appellee*, v. MARY D. OAKLEY, *Appellant*.

(27 P. 2d 290.)

Opinion filed December 9, 1933.

*Fred Robertson, Edward M. Boddington* and *J. O. Emerson,* all of Kansas City, for the appellant.

*David F. Carson* and *E. P. Schrivner,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.:   This was an action to determine the ownership of certain stocks, notes and mortgages, the legal title and possession of which were in Mary D. Oakley, and which were claimed by the plaintiff administrator as a part of her deceased brother's personal estate.

The facts which gave rise to this action may be stated thus:

In 1911 there resided in Kansas City, Kan., a family consisting of Mrs. Mary Oakley, a widow, and her four grown children, Fred C., Albert O., Mary D., and Anna, who was an invalid.   Fred C. Oakley married and left the family home the same year.   Albert married and left home in 1913.   These brothers held the title to the family home, and when they left home they conveyed it to their sister, Mary D. Oakley.   She was a business woman of economical disposition who regularly earned from $85 to $120 per month from before her father's death until 1928.   With some assistance from her brothers Mary provided the living for her mother, her invalid sister and herself.   About 1913 she started a savings account and accumulated $600 in three years.

In 1915 Fred C. Oakley returned to the family home, bringing his wife and two children.   Two more children were born in the family home.   Fred was then a wage worker, earning about the same wages as his sister Mary.   By agreement he and his sister put their earnings together in their mother's checking account in a bank.   Mary's savings deposit also was placed there..   Later this account was kept in the name of Fred and their mother.   From this account all the family expenses were paid by Fred or the mother.   No arrangement was made for Mary D. to check on it, and she did not.   During the World War, and following it, Fred's income, salary and bonuses greatly increased until for a time it reached from $8,000 to $9,000 a year.   Meantime the family expenses increased to $4,000 or $5,000 a year.

By agreement of Fred and Mary D. they begun to make investments in stocks and mortgages, including those in controversy. Title was usually taken in the names of Fred C. Oakley and Mary D. Oakley as joint tenants or to the survivor of them.   Some of them were taken simply in the name of Mary D. Oakley.   Some were taken in the name of Fred C. Oakley and by him assigned to his

sister, Mary D. Oakley, with dating and signature of witness. One certificate of five shares of stock, typical of several, was made payable to—

"Fred C. Oakley and Mary D. Oakley as joint tenants with right of survivorship and not as tenants in common."

Building and loan investments, of which there were a considerable number and variety, were held in title thus:

"F. C. Oakley or Mary D. Oakley, payable to either or to the survivor."

Five notes secured by mortgages payable to the order of Fred C. Oakley were assigned by him thus: "Pay to the order of Mary D. Oakley without recourse. F. C. Oakley." Unimportant variations of these recitals appearing on some of the instruments need not be set down here.

As these stocks and securities were accumulated they were kept in a safety-deposit box which was rented jointly to Fred C. Oakley and Mary D. Oakley.

About 1916 the entire Oakley family began to plan for eventual removal to Wyoming. The mother, Fred C., Albert O., and even the invalid sister Anna, filed on government lands there. Some members of the family undertook to meet the government requirements of actual residence on those homesteads, while Fred C. and Mary D., the wage earners, kept on with their employment. In time some $25,000 or $30,000 of the family savings were invested in sheepranching properties in Wyoming, but that matter is not involved in this lawsuit.

On August 2, 1928, Fred C. Oakley died as the result of an accident. Thereafter his widow, Minnie T. Oakley, and her children, Mrs. Oakley the mother, Mary D., and Anna built a substantial house on the mother's homestead in Wyoming under some understanding that they would all continue to live together as a family. Minnie and her children had received about $12,000 in insurance, workmen's compensation, etc., on account of Fred's death.

Ten days after Fred's death Mary D. Oakley made a will in which she devised all her property to the four children of Fred, subject to a small provision for her mother and invalid sister and a devise of some Wyoming land to the children of her surviving brother, Albert. In this will she named executors to manage her estate, in the event of her death, until Fred's children would be-

come of age, and directed that the income be used for the education of the devisees.

In 1929 Minnie T. Oakley, widow of Fred, returned with her children to Kansas City and brought some sort of action to recover the stocks and securities involved in this action which were kept in the joint safety-deposit box of Fred and Mary. Later that action was dismissed, an administrator was appointed, and this action was begun against Minnie T. Oakley, Mary D. Oakley and one of Mary's attorneys; but eventually that attorney and Minnie were dismissed out of it, and the cause proceeded against Mary D. Oakley.

In the administrator's petition it was alleged that in his life-time Fred C. Oakley had been the owner and in possession of certain stocks, notes and mortgages described, and that plaintiff was entitled thereto, but that the defendant, Mary D. Oakley, claimed title and interest therein and right of possession thereto, and that she had refused to deliver them to plaintiff.

Mary D. Oakley answered admitting her claim of ownership and the possession of the described property and denied all other allegations.

The cause was tried without a jury. The court found that at the time of the death of Fred C. Oakley, August 1, 1928, he and defendant, Mary D. Oakley, were the owners of personal property described in the judgment, and that—

"The said Fred C. Oakley, at the time of his death, was the owner of an undivided sixty-two/seventy-sevenths ($\frac{62}{77}$) thereof, and the defendant Mary D. Oakley was the owner of an undivided fifteen/seventy-sevenths ($\frac{15}{77}$) thereof, the legal title to the same being in Mary D. Oakley. . . .

"That the said personal property should be partitioned and divided between the owners thereof in proportion to their ownership therein, namely: to the plaintiff, as administrator of the estate of Fred C. Oakley, a sixty-two/seventy-sevenths ($\frac{62}{77}$) thereof, and to Mary D. Oakley, defendant, a fifteen/seventy-sevenths ($\frac{15}{77}$) thereof, and that the partition and division of the said personal property, as hereinafter contained in this judgment, is a fair and just division thereof between the plaintiff and the defendant, Mary D. Oakley, in proportion to their aforesaid ownership therein."

The judgment then specified particular items of these stocks and securities to be set apart to the sole and separate use of defendant, Mary D. Oakley, and directed her to transfer, assign and deliver to plaintiff divers and sundry items of property standing in her name. Certain money and other assets in the hands of one Roy K. Stiles

which he had collected and which were involved in this controversy were also disposed of by the judgment, but those are not of present concern.

Mary D. Oakley appeals, assigning error on the admission of incompetent testimony, on the insufficiency of plaintiff's evidence to support the judgment, on the trial court's failure to give judgment on the admitted facts and uncontradicted evidence, and on the rendition of a judgment outside the issues.

Touching these in order: Stiles, a loan broker who had sold the five mortgages in controversy to Fred C. Oakley and who had taken acknowledgment of Fred's assignments of them to Mary D. Oakley, was permitted to testify over timely objection as follows:

"Fred told me he wanted this assignment made and the note assigned over in blank, that in case he should be killed it could be filled in and released by Minnie. In case both of them should be killed on the same trip—and he told me about the trips they made back and forth to the ranch—then the sister could fill in her name and likewise collect the money and release the mortgage.

"Q. Now, then, did he say anything about this money being the sister's, in the event that he and his wife should die, or did he say anything about for whose benefit she should collect it, if he did say anything?

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. That in case he should be taken and Minnie likewise be taken, or Mrs. Fred C. Oakley be taken, that this money could then be handled here for these minor children."

Stiles testified that Fred C. Oakley made similar statements every time he acquired a mortgage through Stiles. On cross-examination he testified:

"Q. But he went over the same rigmarole again, didn't he? A. Whatever you would call it."

Counsel for the appellee suggest that this evidence was admissible under the rule that where a person is the owner and in possession of property, declarations made by him against his own interest in it or in derogation of his own title are admissible against another to whom he afterwards transfers his title. This rule is a familiar one, and we have reread the cases cited by appellee in which it has been applied. (*Piper v. Piper,* 78 Kan. 82, 95 Pac. 1051; *Kitchell v. Hodgen,* 78 Kan. 551, 555, 97 Pac. 369; *Butts v. Butts,* 84 Kan. 475, 114 Pac. 1048; *Kimball v. Edwards,* 91 Kan. 298, 137 Pac. 948.) But this court cannot discern how that rule or the cited cases could justify the testimony of Stiles. In the statements attributed to

Fred C. Oakley when acquiring these mortgages and in the course of executing assignments thereto, Fred said nothing against his own interest nor derogatory of his own title. Rather the contrary. Giving full credence to the testimony of Stiles and fair interpretation to what Fred was thus wont to say, it would appear that his statements tended to minimize the legal effect of the assignments he was making; he was declaring that those assignments should not pass title to his assignee, as they purported to do; and that, notwithstanding those assignments, he was still asserting full title in himself and making statements in his own interest and in behalf of his estate. Indeed, such is the significance which appellee contends should now be given to those statements of the deceased as testified to by Stiles. This court holds that Stiles' testimony touching what Fred C. Oakley said to him was inadmissible to impeach the legal title of the securities standing in the name of Mary D. Oakley and which were assigned to her by Fred C. Oakley, whether such assignments were acknowledged before Stiles in blank or otherwise. The court holds that Stiles' testimony to the effect that when he took Fred's acknowledgment of the assignments the name of the assignee, Mary D. Oakley, did not appear, was not incompetent, although the fair inference deducible from that testimony was that either his veracity as a witness or his sense of official responsibility as a notary public was decidedly below par. His testimony in chief was destroyed on cross-examination, so far as it related to one of the five notes about which Stiles testified (the Pearson note and mortgage); and it was likewise discredited by a photostatic copy of the assignment itself which appears in the record in the indisputable handwriting of Fred C. Oakley. Indeed the trial court must have utterly discredited Stiles' testimony, since its judgment was not based on that testimony in any degree.

Passing next to the testimony of Minnie T. Oakley, the widow of Fred, given in behalf of the plaintiff administrator. She testified over timely and repeated objections that she had heard a conversation between her husband and defendant touching the stocks involved herein:

"Q. Did you ever here Fred in any conversation with Mary with reference to these stocks, about how they should be placed, in whose name they should be placed, and why? You and Fred and Mary together, or Fred and Mary? . . . A. Fred said he was going to put them in Mary's name because she was a single woman and could handle affairs where I could not, being a married woman and having the children.

[COUNSEL FOR DEFENDANT]: "He told you that?

"THE WITNESS: To me and to Mary and the family. His mother and his sister.

"Q. What, if anything, did he [Fred] say about the writing of these names in the stocks, on the face of the certificates?

"A. He asked a man by the name of Roy Olney how those thing should be handled. Roy Olney said the only way they could be handled was for him to sign his—these notes to Mary D. Oakley or the survivor of either, and that they could be handled properly that way."

When the testimony just quoted was given, Minnie T. Oakley was herself a defendant in this action. At this stage of the trial, however, it seemed good strategy to counsel for the administrator to have her dismissed as a party to the action. She was then recalled to the witness stand, and the following colloquy and testimony ensued:

[COUNSEL FOR DEFENDANT]: "Just a moment. We object to this. I assume it is going to be testimony in favor of the administrator and not in favor of the defendant?

"THE COURT: I wish counsel would state in the record here what they expect this testimony to show.

[COUNSEL FOR PLAINTIFF]: "Yes; I will. This witness, if she be permitted to testify, will testify in substance that she and her husband had frequent talks about these stocks—not the mortgages, now, because they didn't have any talks about the mortgages, is my recollection of what she will say. But that she talked with him about these various stocks, stocks that he had acquired and that had been sold and stocks that were in his possession prior to the time of his death, and are now in litigation. And that he told her that inasmuch as she had not had any business experience and that Mary had, that he was going to take these stocks in the name of himself and Mary or the survivor of either, so that Mary could attend to them out of the fullness of her business experience—that is the substance of what she will say—for the benefit of these children. He wanted the children to have the benefit of these investments that he had made. And that is, in substance, what she will testify to. And she will further testify that he said that on numerous occasions, whenever he bought a new stock or whenever the subject of the conversation was brought up between them.

[COUNSEL FOR DEFENDANT]: "The same objection that we just made, we renew to this offer.

"THE COURT: Well, now, under the rulings and construction as laid down by the supreme court there, it seems to me that the testimony should be admitted, especially under this statement here that the testimony will be in effect that the stocks and securities were acquired for the benefit of the children.

[COUNSEL FOR PLAINTIFF]: "They were not acquired for the benefit of the children, but he wanted them ultimately to get them.

"THE COURT: Well, let it go in.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

[COUNSEL FOR PLAINTIFF]: ". . . He wanted it for the children, but he didn't buy them for the benefit of the children, but if anything happened he wanted the children to have them.

[COUNSEL FOR DEFENDANT]: "And not his wife?

[COUNSEL FOR PLAINTIFF]: "Yes; not his wife. He wanted the children to have them and not the wife, because he had provided for her, we claim, with something else.

"THE COURT: Overruled.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Now, in these stocks, as originally issued, I note that they are Fred C. Oakley or Mary D. Oakley or the survivor of either. Did you have any conversation with Fred C. Oakley about that particular thing? A. We did. I asked Fred why those things were arranged that way, and I was not satisfied, and he said it was because he wanted them to be handled by Mary because she was a business woman and he said he wanted them for the children in case anything happened to him. . . .

"From my conversation with Fred I understood that these stocks and securities were placed in the joint name of Fred and Mary so that when Fred died they would go exclusively to the children.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"I asked him how it was he was making arrangements to have Mary's name on these bonds. All of these conversations from June, 1927, or 1928, up to the last one before his death were all just about the same. I told him I was not satisfied. I told him I was not satisfied with the arrangements that these stocks were to go to him and Mary or the survivor. . . .

"I didn't like it, and told him I didn't like it because this property was arranged so it was going to Mary when he died, and I wanted him to change it and talked to him on the average of about once a week, asked him to change it. At each of these times when I would ask him he would tell me it was better the way it was, and he didn't want to change it.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"I felt like this thing of turning the property all over to Mary was wrong, and I told him so all the time."

Defendant contends that all the foregoing testimony was incompetent on one ground or another. But laying aside the objections to its competency, what did it tend to prove? For one thing, it certainly did not prove that the stocks in controversy were part of the estate of Fred C. Oakley. This testimony, so far as pertinent, tended to prove that the stocks were not a part of Fred's estate. It tended to prove exactly what defendant claimed the facts to be, and to prove the authenticity of the title under which Mary D. Oakley

held them—that they were issued to Mary D. Oakley, and in some instances to Fred C. Oakley or Mary D. Oakley, payable to either or to the survivor, and again to Fred C. Oakley and Mary D. Oakley as joint tenants with right of survivorship and not as tenants in common. We need not elaborate on the elementary rule of Kansas law that, except as to exempt personal property, a married man may dispose of his personal property as he sees fit, no matter how greatly his wife may be dissatisfied with such a course and no matter whether his spouse assents thereto or not. (*Osborn v. Osborn,* 102 Kan. 890, 172 Pac. 23, syl. ¶ 3.)

Furthermore, and assuming the truth of Minnie's testimony, it becomes apparent that the administrator of Fred's estate does not have the shadow of a valid claim to the stocks and securities in controversy. His duty and concern are to get together and administer the personal estate of the deceased. By this testimony of the widow, the deceased husband had made an effective and complete disposition of his interest in those stocks in his lifetime— although "she did not like it"; and "was not satisfied"; and although she "felt it was wrong." She testified that she was unable to persuade her husband to refrain from disposing of his personal property in the way he was doing—in the way "Roy Olney" had advised him.

Counsel for the administrator argue that the evidence shows that the property in controversy should be impressed with a trust by implication of law in favor of Fred's widow and children. But the widow's own testimony, which is the only substantial evidence in the record on the point relating to a trust, was that Fred's concern was in behalf of the children, and that his prudent, economical sister Mary was the one he wanted to handle this "trust," not the widow, whom he did not regard as a business woman. Indeed, that point of view was gravely pressed on the trial court's attention by counsel for the administrator. The record reads:

[COUNSEL FOR PLAINTIFF]: "He [the deceased] wanted it for the children.
[COUNSEL FOR DEFENDANT]: "And not his wife?"
[COUNSEL FOR PLAINTIFF]: "Yes, and not his wife; he wanted the children to have them, and not his wife, because he had provided for her, we claim, with something else."

If we adopt this theory of a trust in these stocks and bonds in Mary's hands as created by her brother for the benefit of his children only, and not for his wife, then it becomes as plain as the noon-

day sun that the administrator has no claim to the stocks and bonds; he is charged with no duty as administrator concerning that trust, neither to enforce it nor to terminate it and take over the trust property for the benefit of the Fred C. Oakley estate.

Defendant also complains of the admission in evidence of the deposition of one Garst, an attorney of Wyoming. He deposed that he was attorney for Minnie T. Oakley, and that the defendant and her surviving brother came to his office on his invitation, in an effort to compose differences between his client and defendant; and that while there she, Mary D. Oakley—

"Took a rather belligerent attitude toward me and told me that the stocks and bonds had been placed in her hands for her keeping by her brother, Fred, for the benefit of his wife, who I understood to be Mrs. Minnie Oakley, and for the benefit of their children.

". . . During the conversation she disclaimed any financial interest in these securities except the one mortgage."

The testimony of this deponent was considerably shaken on cross-examination, and was altogether at variance with the testimony of Albert O. Oakley, defendant's brother, who was present when the alleged conversation was had. It was contradicted by the testimony of Mary D. Oakley at the trial; and it was at variance with the theory of plaintiff's counsel who, in the stress of the trial, declared that the securities were *not* for the wife, but for the children, because the wife had been otherwise provided for. As this testimony was given by deposition this court has its own responsibility to determine its credence, and we are of united opinion that it was of no probative value in this lawsuit. It is also apparent that no credence was accorded to it by the trial court, in view of the judgment which it rendered in this cause; and to that matter we now turn.

The trial court found that at the time of his death Fred C. Oakley was the owner of an undivided 62/77 of the stocks and mortgages in controversy and that Mary D. Oakley was the owner of an undivided 15/77 of them. The court apportioned the securities between the administrator and Mary D. Oakley on that basis.

It is defendant's contention that there was no foundation in the issues or the evidence for such an apportionment or such a judgment. The principal features of the evidence under which the administrator sought to establish his claim to the property have been considered above. However, the trial court laid plaintiff's evidence

completely to one side, and apparently on some computation based on the relative sums of money Fred C. Oakley and his sister Mary D. Oakley contributed over a period of twelve or thirteen years to their common fund out of which these stocks and mortgages were purchased, the court determined that their respective contributions had been in the proportion of 62 and 15, and gave judgment accordingly.

The record does not show what was the value of the property in controversy, but in the brief of appellee it is said to have had a face value of $17,033 at the time of the trial. By appellee's brief we are also advised that during the long period when Fred and Mary were pooling their earnings in a common fund Fred's earnings were $73,662.50 and Mary's were $14,485. To this contribution of Mary's should be added the nest egg of $600 she had accumulated before Fred had acquired the habit of saving, and there should also be added thereto the sum of $2,900 which she turned into the common fund from the sale of her house which had served the purpose of a home for Fred and his family for a dozen years. There is nothing in the record upon which to make a computation of the relative expense of Fred's family of six persons as compared to Mary's individual living expense, other than that Fred kept two automobiles and was liberal towards his family, while Mary was rigidly economical. It would be fair, we presume, to charge the living expenses of the mother and invalid sister to Fred and Mary equally.

A diligent and protracted study of this record constrains this court to hold that the evidence was altogether insufficient to justify a *pro rata* division of the property, even if an equitable division of the property had been within the issues.

This court does not overlook the point that issues may be informally enlarged by tacit consent of the litigants and by the range of the unchallenged evidence. And on this point, in the brief of appellee, it is said:

"Assuming for the sake of argument . . . that the court received improper evidence in this case, in receiving the testimony of Stiles, Minnie T. Oakley and Garst, about which he complains . . . nevertheless its reception, if erroneous, was harmless, because there was ample competent testimony upon which to base the judgment; in fact, the judgment could have been based upon the testimony of the appellant herself, and his [its] findings are supported by ample, competent testimony, aside from any testimony of the witnesses whose evidence counsel complains about. Mary D. Oakley supplied all the evidence that was necessary to support the judgment."

Mary's testimony, upon which this theory of a partnership is argued, reads:

*"Cross-examination.*

"Q. What is it you claim about this? Do you claim these mortgages and stocks are yours? A. Yes, with the agreement we had.

"Q. How did you get them? A. With the agreement Fred and I had.

"Q. What was the agreement? A. That we would buy them jointly and if I should die he should get them and if he should die I should get them, with the right of survivorship. . . . We discussed and bought every one of the mortgages together. He gave the mortgages to me and the stocks were put in our name jointly. I am not claiming that I had enough money over and above my earnings to buy such a quantity of stocks and mortgages as these, but I claim I had an agreement and that Fred was to give these things to me, and that agreement was right at the time we got them. Fred collected what interest was paid to Stiles up to the time he died. The interest that was collected off of these mortgages and other securities was put in the joint bank account, and it was not necessarily invested in other securities."

Elsewhere Mary testified:

"Q. You may state what those arrangements were, or state your conversations back and forth. A. We *pooled* our interests.

"Q. . . . Did you have any understanding or agreement about what you would do with your—with the interests you pooled, and was there anything said on the subject? A. We did.

"Q. What was said? I want the conversations between you and Fred Oakley. A. Well, he would take our joint moneys and invest it, bank it in my mother's account, and that he could draw on it, and we would be *partners* in the transactions that were going on after that."

We cannot interpret this testimony to mean that the brother and sister were engaged in such a business adventure as the law characterizes as a partnership. She was merely using the common language of a layman to express the fact that she and her brother, pursuant to this agreement, were collaborating in the accumulation of securities which should belong to them jointly with right of survivorship. Such an agreement is valid under our law. (*Malone v. Sullivan,* 136 Kan. 193, 14 P. 2d 647.)

To summarize and conclude, this court holds that the evidence was insufficient to overthrow Mary D. Oakley's legal title to the stocks and mortgages in controversy and insufficient to support the judgment awarding the administrator any share thereof.

The judgment is reversed, and the cause remanded with instructions to render judgment for defendant.

HUTCHISON, J., not sitting.