No. 45,100

In the Matter of the Estates of C. V. Carlson, Deceased, and Emma Carlson, Deceased; and in the Matter of the Partnership Estate of Victor Carlson, Deceased, and Elmer Carlson, Surviving Partner. (LESLIE L. NEEDHAM, ADMINISTRATOR WITH WILL ANNEXED OF C. V. CARLSON ESTATE and ADMINISTRATOR OF EMMA CARLSON ESTATE, *Appellant,* v. ELMER CARLSON and VIOLA GARVER, *Appellees.*)

(443 P. 2d 339)

Opinion filed July 13, 1968.

*Elmo Lund,* of Oberlin, argued the cause, and *L. F. Cushenbery* and *W. H. Hayes,* of Oberlin, were with him on the brief for appellant.

*Marion W. Chipman,* of Olathe, argued the cause, and *Robert Lewis, Sr.* and *Robert Lewis, Jr.,* of Atwood, were with him on the brief for appellees.

The opinion of the court was delivered by

FATZER, J.: The actions involved in this appeal were brought by the administrator of the estates of Victor Carlson, deceased, also known as C. V. Carlson, and Emma Carlson, deceased, against the defendants, Elmer Carlson and Viola Garver, the son and a daughter of the decedents, to bring property back into the estates of the decedents, which, it was alleged, the defendants had caused to be transferred to their names during the lifetime of their mother and father. Three of the cases sought relief upon the grounds that the decedents were incompetent and of unsound mind at the time of the alleged transfers; that the defendants had forged the decedents' names to various documents conveying title to the defendants; that each defendant occupied a confidential and fiduciary relationship with the decedents, and that the transfers and conveyances of property were made without independent advice, with-

out consideration, and as a result of undue influence of the defendants.

The plaintiff, as administrator of both decedents' estates, is referred to as the plaintiff; Victor Carlson, also known as C. V. Carlson, is referred to as Victor; Emma Carlson is referred to as Emma; Elmer Carlson is referred to as Elmer, and Viola Garver is referred to as Viola.

This case involves a young Swedish immigrant who married a Kansas girl and raised a family on a homestead in Rawlins County. Victor was born in Sweden in 1872 and came to America as a young man. Emma, who later married Victor, was born in 1886. Victor homesteaded and obtained a patent to a quarter section of land referred to as the home place, in 1905. In 1907 he purchased another quarter section of land called the "Call" land of which about 100 acres was tillable. Victor and Emma had five children; one son, Elmer, and four daughters, one of whom is the defendant Viola.

In 1948 Victor had his will prepared by his attorney, Lloyd Vieux, now deceased, who practiced law at Atwood. By the terms of his will, Emma was devised and bequeathed ½ of all the testator's property; Elmer was bequeathed $100, and the balance of his estate was devised and bequeathed ⅛ to each of his four daughters. The will provided, in part:

"It is my will that the sum of $100.00 be paid from my estate to Elmer Carlson, my son of Herndon, Rawlins County, Kansas, and that he share no further in my estate for the reason that during his lifetime, I have provided him with more than any of the other children, hereinafter named, will receive upon my death. During my lifetime, I have provided for the payment of three quarters of land, provided him with the land and cattle, and he has acquired more property than my other children as stated aforesaid."

Victor was 90 years of age when he died testate on April 8, 1963. His will was admitted to probate in Rawlins County, and its validity has never been questioned. About three months later, on July 20, 1963, Emma died intestate at the age of 77 years and her estate was duly probated in Rawlins County.

Elmer lived with his parents on the home place until their death. Viola had married, but in 1950 she obtained a divorce, and she and her young daughter, Jeanne Ann Garver, moved back to the home place and lived with her parents until their death. Viola paid no board and room or similar expenses.

At a pretrial conference which included many stipulations of the parties and admissions by the defendants, the district court ruled

that a confidential or fiduciary relationship existed between Victor and Emma and Elmer and Viola, and that for purposes of the trial, the burden was upon the defendants to show the utmost good faith while acting in that capacity.

The consolidated lawsuits were tried to an advisory jury and to the district court in a long and complicated trial which lasted eight days. The parties were afforded opportunity to introduce all their evidence including evidence obtained at pretrial discovery proceedings. The advisory jury was instructed, and was asked to answer special questions on the issues involved. No complaint is here made of any of the court's instructions to the jury. At the conclusion of the trial, the jury returned answers to the special questions as follows:

"No. 1. Was Victor Carlson mentally competent to understand the nature and effect of a deed to real estate on February 8, 1957?

"A. Yes.

"No. 2. Was Victor Carlson unduly influenced by Elmer C. Carlson when he executed the above deed?

"A. No.

"No. 3. Was Emma Carlson unduly influenced by Elmer C. Carlson when she executed the above deed?

"A. No.

"No. 4. Did Victor Carlson and Emma Carlson have independent advice, as defined in the instructions, concerning the transfer of such real estate?

"A. Yes.

"No. 5. If the answer to the above question is 'Yes,' state who provided said independent advice to said C. V. Carlson and Emma Carlson.

"A. *Lon Nichols and Lloyd Vieux.*

"No. 6. How much did the defendant, Elmer Carlson, pay from his own funds in complying with the terms of said contract?

"A. $15,000.

"No. 7. What was the reasonable market value of the land, described in Plaintiff's Exhibit No. 70, on February 8, 1957?

"A. $15,000.

"No. 8. Do you find that there was an oral agreement entered into between Victor Carlson, Emma Carlson and Elmer Carlson in the latter part of 1954, that all money earned by any of them, or then belonging to any of them, should be placed in various bank accounts, savings accounts and certificates of deposit, and that such accounts, certificates and other investments, and personal property then owned, or thereafter acquired, should belong to all and/or any of them for such use as all and/or any of them wished to make of such property, and that all of such property should pass to, and be the property of, the survivor of them?

"A. *Yes.*

"If your answer to Question No. 8 is 'Yes', then answer Question No. 9.

"No. 9. If you answer the foregoing Question 'yes', state whether or not

the said agreement was revoked by later acts and conduct of Elmer Carlson and Viola Garver.

"A. No."

The cases here involved deal with the relationship and dealings between Elmer and Victor and Emma, and Viola. To fully understand that relationship and the manner in which business and financial matters were handled, it is necessary to cover nearly 40 years in the life of the Carlson family. This story is best told by the detailed findings of fact and conclusions of law of the district court, taking into consideration the answers to special questions by the advisory jury, and the district court's independent consideration of the evidence adduced at the trial. The findings of fact and conclusions of law read:

### "FINDINGS OF FACT

"1. The Court adopts the findings and answers to questions of the jury, as being fully substantiated by the evidence submitted to them.

"2. The answers to the special questions, by the jury, and particularly the answer to Question No. 8, eliminate many of the contentions of the Plaintiff in the respective Petitions, since such claims would be rendered moot, and recovery thereon would be precluded by virtue of the descent and ownership of the property and moneys upon the death of C. V. and Emma Carlson.

"3. Case No. 6095 is an action brought by the administrator with will annexed of the estate of Victor Carlson, deceased, against Elmer Carlson, for the purpose of bringing property back into the estate.

"4. Case No. 6096 is another action brought by the administrator with will annexed of the estate of Victor Carlson, deceased, against Viola Garver to bring property back into the estate.

"5. Case No. 6109 is an action brought by the administrator of the estate of Emma Carlson, deceased, against Elmer Carlson and Viola Garver to bring property back into that estate.

"6. A further issue is the appeal from decision of the Probate Court of Rawlins County, Case No. 2400, which court held that there was no property or other assets belonging to the partnership estate from the partnership of C. V. Carlson and Elmer Carlson. This case is District Court Case No. 6120.

"7. Victor Carlson was born in Sweden and came to the United States as a young man. He was a homesteader and obtained a patent on the Southwest Quarter of Section 28-3-31 in 1905. In 1907 he purchased another quarter section known as the Call land. In the early years there was approximately 100 acres of this land which was farmed. The Carlson family consisted of Victor and Emma Carlson, Elmer Carlson and his four sisters, Lillian, now Lillian Nelson, Elna, now Elna Brown, Dorothy, now Dorothy Graham, and Viola, now Viola Garver. All of the children survived their parents.

"8. Elmer Carlson, the only son in the family, attended grade school until he was 16 years old and quit school without graduating. He began to work full time at that age to assist the family finances and to make it possible for the sisters to attend high school. All of his earnings went toward the support

of the family, and the funds which he earned from working for other farmers in the community and from work at his home were turned over to Victor Carlson who used the money as his own or deposited it in his bank account. This pattern of work and doing business continued until Elmer Carlson was over 40 years old. Elmer has never married.

"9. That Elmer Carlson has always been a hard worker and a good farmer; that Victor Carlson was an easy going and not ambitious man, when it came to work. Victor did do some work in the fields with horses, but Victor Carlson never learned to drive a tractor or a truck and did little or no work, with exception of a few chores about the farm, from 1938 until his death; and substantially all of the farm work and income producing labor done on the Carlson farm from 1938 has been done by Elmer Carlson. That although Victor Carlson took no part in the work of the farm, practically all of the income from farming and from Elmer Carlson's work for others was deposited in a bank account in the name of Victor Carlson until 1952. Elmer did write some checks on this account signing Victor Carlson's name by Elmer Carlson. All income tax returns were made in the name of Victor Carlson until 1953, and Elmer Carlson was shown on many of them as a dependent of Victor Carlson. Elmer Carlson made his first income tax return in 1953 when he was 44 years old and Victor Carlson was 81 years old.

"10. In 1946 August Carlson died, and Victor Carlson was appointed administrator of his estate. His attorney was Lloyd H. Vieux, who continued to be his attorney and close friend until the death of Mr. Vieux in 1961. Through this estate Victor Carlson obtained approximately $16,000 through inheritance and fees, a part of which was spent by him and his wife on a trip to Sweden.

"11. In 1953 Victor and Elmer Carlson began making partnership income tax returns upon the advice of Lloyd H. Vieux, Victor's attorney, that they could effect a tax savings in this manner. Neither Victor or Elmer understood income tax law or regulations or knew the nature or effect of a partnership return or of a partnership.

"12. Both Victor Carlson and Emma Carlson were mentally competent to understand the nature and effect of the deed executed on February 8, 1957, whereby the land was deeded to Elmer Carlson.

"13. No undue influence was exercised by Elmer Carlson when his parents executed such deed.

"14. Victor Carlson had independent advice concerning the execution of the deed to the land. Such advice was provided by A. B. (Lon) Nichols and Lloyd Vieux. The evidence clearly disclosed that Victor Carlson recognized such transfer in conversations with many people, subsequent to the transfer.

"15. That Elmer Carlson paid for said land as provided in the contract, and the deed was delivered to and recorded by him. That it was understood and intended by the parties that the sum of $15,000 paid to Victor and Emma Carlson, for said land, should not be included in the Agreement, as set forth in Finding No. 17 hereof, but should become the sole property of Victor and Emma Carlson, subject to their disposal by will or intestate succession.

"16. Victor Carlson and Emma Carlson were mentally competent to understand the nature and effect of the bills of sale executed in 1955 and 1956 for the personal property transferred. They had independent advice concerning

the execution of same, and such bills of sale were prepared by Lloyd Vieux, attorney for Victor Carlson.

"17. That an oral agreement was entered into between Victor Carlson, Emma Carlson and Elmer Carlson in the latter part of 1954, that all money earned by any of them, or then belonging to any of them, should be placed in various bank accounts, savings accounts and certificates of deposit, and that such accounts, certificates and other investments, and personal property then owned, or thereafter acquired, should belong to all and/or any of them for such use as all and/or any of them wished to make of such property, and that all of such property should pass to, and be the property of, the survivor of them.

"18. That all of the parties to the agreement, set forth in Finding No. 17, were mentally competent to understand the nature and effect of such agreement, and that such agreement remained in full force and effect at the time of the death of Victor Carlson and of Emma Carlson, and had not been revoked by the parties. That there was no fraud, deceit or undue influence practiced by Elmer Carlson, upon his parents, at the time of the making of such agreement, but that such was entered into freely and voluntarily by the parties thereto.

"19. That the execution of the bills of sale, set out in Finding No. 16, did not require the filing of a gift tax return by Victor or Emma Carlson.

"20. That Victor Carlson and Emma Carlson had a checking account in the Farmers National Bank of Atwood, Kansas, and that the money represented by this account had been inherited by Victor Carlson; that the money represented by this account was included in the agreement of 1954, and that Elmer Carlson had full and complete access to said funds during the existence of said agreement, but that said Elmer Carlson at no time wrote any check on said account and made use of the money represented by the same; that in 1957 Viola Garver was given the right to draw upon this account by Victor Carlson and Emma Carlson; that the decision to give Viola Garver this right to draw upon this account was made by Victor Carlson and Emma Carlson, freely, knowingly and voluntarily and was not the result of any suggestions or undue influence practiced upon them by either Viola Garver or Elmer Carlson; that the signatures of Victor Carlson and Emma Carlson on the signature card giving Viola Garver the right to draw upon this account are the authentic signatures of the said Victor Carlson and Emma Carlson placed there of their own free will; that a number of checks were introduced in this action bearing the signatures of Victor Carlson or Emma Carlson, which checks went to purchase bonds or other securities and investments for Viola Garver and her daughter; that the Court finds that the signatures appearing on said checks are the true and authentic signatures of Victor Carlson or Emma Carlson, as the case may be, and were placed there freely, knowingly and understandingly by Victor Carlson or Emma Carlson, and were not the result of undue influence, fraud or deceit practiced upon them.

"21. That as of the date of the death of C. V. Carlson there were no partnership assets on hand, and the Court finds that although there was no formal dissolution of the partnership and no formal accounting had between C. V. Carlson and Elmer Carlson, that the agreement entered into in 1954, whereby all assets on hand at the date of death of any of the parties were to pass to the survivor or survivors and the deed of 1957, did have the effect of an

agreement that all partnership assets should pass to and become the property of the surviving partner, and that as a result of such agreement, all partnership assets passed to and became the property of Elmer Carlson as of the date of the death of C. V. Carlson.

"22. That Victor Carlson was fully capable of taking care of his business affairs until late 1959 or early 1960. That he chose to permit Elmer Carlson to handle practically all of his business for several years prior to that time, but that he was capable of so doing, until late 1959 or early 1960.

"23. That Emma Carlson was fully capable of handling her business affairs until a very short time prior to her death on July 20, 1963. That she chose to permit Elmer Carlson to handle practically all of her business affairs for several years prior to her death."

## "CONCLUSIONS OF LAW

"1. That the Court having reviewed the evidence generally finds for the defendants, Elmer Carlson and Viola Garver, on all issues and agrees with and hereby adopts as its own findings, the findings made and returned by the Advisory Jury impaneled to hear this case.

"2. That the title to all money, assets, personal property and securities which were on hand at the date of the death of Victor Carlson and Emma Carlson, no matter how titled, and which are in dispute in the actions concerning Elmer Carlson passed to and became the sole property of Elmer Carlson as a result of the agreement entered into in the latter part of 1954, and the estates of Victor Carlson and Emma Carlson are hereby forever barred from claiming or asserting any right, title or interest in, or to any of said assets.

"3. That all transfers made by Victor Carlson or Emma Carlson to Viola Garver were valid and vested title in such funds in the said Viola Garver, and that all transfers made to Viola Garver by the action of Elmer Carlson during the lifetime of Victor Carlson and Emma Carlson were made by the said Elmer Carlson under the right granted him by the aforesaid agreement in 1954, and said transfers were valid, and the estates of Victor Carlson and Emma Carlson are hereby forever barred from claiming or asserting any right, title or interest in or to any of said assets.

"4. That there was no fraud, deceit or undue influence of any kind practiced or undue advantage taken by Elmer Carlson or Viola Garver in their business relations with their parents in securing any of the transfers involved in these cases.

"5. The weight of the evidence shows that despite the manner in which bank accounts, certificates of deposit, savings accounts or securities were titled prior to 1954 or subsequent thereto, with the exception of the inheritances of Victor Carlson and Emma Carlson, that said funds had been earned by the labor of Elmer Carlson, and he had a substantial interest in all of such bank accounts, certificates of deposit, investments and securities, despite the fact they were titled in the name of Victor Carlson or Emma Carlson.

"6. The evidence offered on behalf of the defendants overcomes any presumption of undue influence, duress or fraud involved in any transfer made from Victor Carlson or Emma Carlson to either Elmer Carlson or Viola Garver, and the weight of the evidence establishes that such transfers were the free, knowing, voluntary and understanding acts of Victor Carlson or Emma Carlson.

"7. That by reason of the warranty deed executed and delivered by Victor Carlson and Emma Carlson on February 8, 1957, which deed was given for a good, valuable and sufficient consideration, Elmer Carlson became the owner of a fee simple title to the real estate described in said deed.

"8. That the Estates of Victor Carlson and Emma Carlson, deceased, be and the same are forever barred from claiming or asserting any right, title or interest in or to said real estate.

"9. That upon the death of Victor Carlson there was no interest in any property which was property of the partnership, and that by virtue of the agreement made in the latter part of 1954, all of the same became the property of Elmer Carlson, if he survived Emma Carlson.

"10. That a fiduciary relationship existed between Victor and Emma Carlson, on one hand, and Elmer Carlson. Such relationship existed by reason of the partnership between Victor and Elmer Carlson; and by reason of the fact that Elmer Carlson handled practically all the business affairs for his father and mother. Fiduciary relationship is almost impossible to define, and whether or not it exists, and whether or not it has been abused, to a large extent depends on the facts and circumstances of each case. The relationship, under the circumstances of each case, requires fair dealing and common honesty by the fiduciary. Under the facts in this case, it is the conclusion of this Court that Elmer Carlson did not violate the fiduciary relationship."

Post trial motions by the plaintiff were filed to set aside answers to special questions, and alleged erroneous findings of fact and conclusions of law. The motions were considered by the district court and overruled. Judgment was entered in favor of the defendants on all issues in the consolidated cases in accordance with the written findings of fact and conclusions of law, which were made a part of the district court's judgment. This appeal followed.

We first turn to the court's finding of fact No. 17 which we regard as the important question in the case. The court found that in late 1954, Victor and Emma and Elmer entered into an oral contract which established a joint tenancy with right of survivorship in all of the personal property then owned or thereafter acquired by Elmer and his mother and father, and that all such property would eventually belong to the survivor of them.

A joint tenancy exists where a single estate in property, real or personal, is owned by two or more persons, under one instrument or act of the parties. The grand incident of joint tenancy is survivorship, by which the entire tenancy on the decrease of any joint tenant remains to the survivors, and at length to the last survivor. (*Bouska v. Bouska*, 159 Kan. 276, 279, 153 P. 2d 923.) An estate in joint tenancy in personal property may be created between two or more persons by an oral contract (*Corson v. Oakley*, 138 Kan. 520, 27 P.

2d 290), and the provisions of K. S. A. 58-501 do not preclude proof by oral evidence of an oral joint tenancy contract, but require that the terms of such contract clearly disclose that a joint tenancy was intended to be established. (*Edwards v. Ledford,* 201 Kan. 518, 441 P. 2d 834.)

As indicated, at the pretrial conference the district court ruled that a confidential or fiduciary relationship existed between Elmer and Victor and Emma and that the burden was upon Elmer to show the utmost good faith while acting in that capacity. Likewise, in conclusion of law No. 10, the court concluded that Elmer had sustained the burden of proof cast upon him and he had not violated that relationship.

Turning to the legal points, the plaintiff attacks findings of fact No. 17, and contends the benefits conferred upon Elmer by the oral contract were invalid and should not be permitted to stand. It is asserted that, and the defendants do not deny, there was no evidence that Victor and Emma received any advice, independent or otherwise, before making the contract with Elmer.

The plaintiff vigorously argues that under our decisions, persons standing in a confidential or fiduciary relationship toward others, cannot entitle themselves to hold benefits which those others may have conferred upon them by gift or contract, unless they can show to the satisfaction of the court, that the persons by whom the benefits have been conferred, had competent and independent advice in conferring them. He cites and relies upon *Paddock v. Pulsifer,* 43 Kan. 718, 23 Pac. 1049; *Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634; *Madden v. Glathart,* 125 Kan. 466, 473, 265 Pac. 42; *Overstreet v. Beadles,* 151 Kan. 842, 101 P. 2d 874; *Henks v. Panning,* 175 Kan. 424, 264 P. 2d 483, and *Nelson, Administrator v. Dague,* 194 Kan. 195, 398 P. 2d 268.

A similar contention was made in *Jernberg v. Evangelical Lutheran Home for the Aged,* 156 Kan. 167, 131 P. 2d 691, where many of the same authorities were relied upon, and in answer, Mr. Justice Harvey said:

"The principles of law set out and applied in the cases relied upon by appellant are quite well established in this state, and we have no desire to detract from them. The real question is whether they are applicable here. In the argument upon this point appellant does not complain of the findings of fact made by the trial court. A feeling of mutual confidence and trust, brought about by close relations, acts of kindness and friendship, frequently prompt gifts *inter vivos* or testamentary. Certainly there is nothing wrong with the fact they do so; neither does the law condemn such gifts. *It is only when that*

*relationship is used by one of the parties to take advantage of the other for financial gain that the law throws around such other its protecting arm to see that no undue advantage has been taken of the donor, and if the circumstances warrant, requires a showing of independent advice* . . ." (173.) (Emphasis supplied.)

Attention is also directed to similar language in *Barger v. French,* 122 Kan. 607, 612, 253 Pac. 230, that, ". . . *if the evidence warrants it,* there should be a judicious application of the principle of independent advice recognized by courts of equity . . ." (Emphasis supplied.)

We are of the opinion the evidence in the instant case does not warrant the application of the rule of independent advice. The oral contract of 1954 must be viewed in the light of the circumstances which gave rise to it. In the first place, it is abundantly clear that the great majority of property involved in that contract was in fact the lifetime earnings of Elmer. In the second place, there is nothing in the record which suggests that Elmer overreached his parents or took advantage of them in any way, or that his influence was acquired and abused, or their confidence imposed and betrayed. The evidence is to the contrary. The plaintiff concedes Victor and Emma were of sound mind when the contract was entered into, and the district court's finding that they clearly understood the transaction and freely and voluntarily entered into the contract without restraint or undue influence is amply sustained by the record. The contract merely confirmed Elmer's interest in his own money then placed in Victor's name in various bank accounts, savings accounts and certificates of deposit, and personal property then owned or thereafter acquired as result of Elmer's efforts, with right of survivorship. There was adequate consideration for the contract, and equally important is the fact that it was performed to the complete satisfaction of the parties for a period of nine years—until the death of Victor and Emma.

The existence of a confidential or fiduciary relationship between persons does not, as a matter of law, operate to bar the right of the beneficiary to enter into a contract or to receive a gift. If the person who conferred the benefit was at the time of sound mind and clearly understood the transaction, and executed a free will in the act, being under no restraint or undue influence, and, where the evidence requires it, there was adequate consideration, the transaction will be sustained. While we have no desire to detract from our decisions applying the rule of independent advice if the

circumstances warrant it, the evidence clearly does not require its application in the instant case. (*Jernberg v. Evangelical Lutheran Home for the Aged,* supra; *Barger v. French,* supra.)

It is contended the district court erred in permitting hearsay evidence by Elmer and Viola when they testified to conversations and transactions had with their deceased parents. A short answer to the contention is that the record shows no objection was made by the plaintiff when the evidence was offered. This court has adhered to the rule in K. S. A. 60-404, and has consistently held that objections to the admissibility of evidence will not for the first time be considered on appeal in the absence of timely objection made thereto. (*State v. Freeman,* 195 Kan. 561, 564, 408 P. 2d 612, Cert. den. 384 U. S. 1025, 16 L. Ed. 2d 1030, 86 S. Ct. 1981; *Grohusky v. Atlas Assurance Co.,* 195 Kan. 626, 629, 408 P. 2d 697; *State v. Jolly,* 196 Kan. 56, 58, 410 P. 2d 267; *State v. Donahue,* 197 Kan. 317, 320, 416 P. 2d 287; *State v. Cantrell,* 201 Kan. 182, 440 P. 2d 580; *Humphries v. State Highway Commission,* 201 Kan. 544, 442 P. 2d 475.) Moreover, the plaintiff cross-examined the witnesses on the very subject about which he now complains. In addition, in *Pickering v. Hollabaugh,* 194 Kan. 804, 401 P. 2d 891, it was said:

". . . G. S. 1949, 60-2804 which prohibited a person from testifying respecting transactions or communications had personally with a person since deceased was not incorporated into the new Code of Civil Procedure and has therefore been repealed. This was the only prohibition against a party to a transaction with a person since deceased testifying as to his statements or declarations . . ." (l. c. 808.)

Under the new Code of Civil Procedure, the test of admissibility of evidence is its relevance. (K. S. A. 60-407.) In the absence of an objection to Elmer's testimony of conversations had with his deceased parents, and there being no motion to strike the testimony, the contention it was improperly received comes too late.

The plaintiff next contends the district court erred in finding of fact No. 14, that Victor and Emma had independent advice when they executed a deed to three quarter sections of land to Elmer on February 8, 1957, and that thereafter Victor recognized such transfer in conversations with many people. Both the advisory jury, and the district court on its independent review of the evidence, found that Victor and Emma received independent advice.

The record shows that Lloyd Vieux had been Victor's attorney and personal friend since 1946. From that time until Mr. Vieux's

death in 1961, he advised Victor on business matters and conferred with him many, many times. Likewise, Lon Nichols, the president of the Farmers National Bank in Atwood, was a lifelong and close friend of Victor in whom he placed particular confidence with respect to business matters. Nearly every time Victor was in Atwood he would stop at the bank and visit with Mr. Nichols, who died prior to the trial of this case.

In January, 1957, before the deed was executed, Victor, Emma and Viola went to Atwood to discuss business matters with Nichols. He invited them into his office in the bank. Viola testified that Victor told Nichols that:

"'Emma and I are thinking of deeding the rest of our land over to Elmer,' and he said that he (Elmer) had stayed there and worked and paid for the land and stayed there and looked after them, and whenever they needed anything, he was right there to help them, and they asked him (Nichols) what he thought about it."

(The district court would not permit Viola to further detail the conversation.) Victor asked Nichols to prepare a deed for them, but he told Victor and Emma to go see Lloyd Vieux. After leaving the bank, Victor told Emma and Viola he was going to talk with Lloyd Vieux and then went to Vieux's office.

There was evidence that on February 8, 1957, in the presence of a neighbor, Milton Peterson, Victor reminded Emma they were going to town that afternoon to deed the land to Elmer. Later that day, Victor, Emma, Viola and Elmer went to Vieux's office. The record shows that Victor reminded Vieux that two bills of sale had been previously executed for the cattle and machinery, but they had done nothing about the land and they had come to his office to make some arrangements about selling it. Victor stated he thought that Elmer had already paid for two quarters of the land and that Elmer should pay $4,000 for the other quarter. Elmer offered to pay $5,000 per quarter or $15,000 for the three quarters. Vieux asked, "[h]ow does that sound, Victor?" and Victor said, "that sounds pretty good to me." Victor asked Emma about it, and she said "she thought it was real good so far as she was concerned." In addition to the stated consideration in money, Elmer agreed to take care of his parents and all their needs for as long as they lived. A warranty deed and a contract for the sale of the land were prepared conveying the three quarter sections to Elmer with Victor and Emma reserving a life estate therein.

The deed and contract were placed in escrow until Elmer paid the $15,000, when the deed was then delivered to him.

Courts view with suspicion gifts or contracts between parties occupying a confidential or fiduciary relationship and will scrutinize them closely and rescind or cancel them unless the one claiming thereunder shows by convincing evidence there was no restraint or undue influence or undue advantage obtained, and that there was good faith on his part. In *Wilkinson v. Cummings*, 194 Kan. 609, 400 P. 2d 729, it was held:

"Where a confidential relationship is shown to exist between parties to a deed, the burden is upon the grantee to show that the conveyance was made in good faith and not induced by undue influence." (Syl. ¶ 2.)

Other cases hold that, where it is required, the evidence show there was adequate consideration. (*Henks v. Panning*, supra; *Nelson, Administrator v. Dague*, supra, and cases cited; *Cersovsky v. Cersovsky*, 201 Kan. 463, 441 P. 2d 829.)

Some of our cases in dealing with the question of undue influence, indiscriminately use the term "fiduciary relationship" and "confidential relationship" referring to them as being synonymous with each other insofar as they affect the good-faith dealings between the parties to the relationship. There is, however, a technical distinction between the two terms. The former being more correctly applied to legal relationships between the parties such as attorney and client, guardian and ward, administrator and heirs, trustee and *cestui qui* trust, and similar other ones, while the latter might include them and also every other relationship wherein confidence is rightly imposed and is exercised, among which is the superiority of knowledge of the facts affecting the subject matter on the part of the one seeking to uphold the contract, and confidence is reposed in him by the other to make full disclosure. (*Wilkinson v. Cummings*, supra; *Henks v. Panning*, supra.)

The requirement of proof of independent advice is designed to provide assurance that the aged or infirm or otherwise dependent person conferring the benefit knew what he was doing and did it of his own free will. As indicated, the rule of independent advice is applied only under circumstances where the evidence warrants it (*Jernberg v. Evangelical Lutheran Home for the Aged*, supra; *Barger v. French*, supra), and it would appear that our decisions (*Madden v. Glathart*, supra; *Overstreet v. Beadles*, supra; *Loucks v. McCormick*, 198 Kan. 351, 424 P. 2d 555, Syl. ¶ 2), do not require appli-

cation of the rule where the party upon whom is cast the burden of showing good faith presents substantial evidence that the deed or contract was made in good faith, not induced by undue influence, and for a valuable consideration.

Be that as it may, there was substantial evidence that in the fall of 1957, after Victor and Emma had sold the real estate to Elmer, Victor told several of his friends that he had transferred the land to Elmer; that he did not worry about farming any more as he had sold the land and everything to Elmer, and when one of his friends wanted an oil and gas lease he told him that he would have to see Elmer as he had sold all of his land to Elmer. On her deathbed, Emma told her brother that, "she feared Elmer would have trouble and that he had earned everything and she wanted Elmer to have everything and didn't want anything changed." As indicated, Victor knew he had sold the land to Elmer and wanted the deed made. He consulted with his banker and his lawyer, two of his close friends and business confidants. Both Victor and Emma were mentally competent to understand the nature and effect of their deed. We are of the opinion there was no undue influence and the district court's finding of independent advice was abundantly sustained. (*Stunkel v. Stahlhut,* 128 Kan. 383, 389, 277 Pac. 1023; *Stanley v. Stanley,* 131 Kan. 71, 289 Pac. 406; *Wilkinson v. Cummings,* supra.)

The plaintiff asserts the district court's findings of fact No. 15 that Elmer paid for the land as provided in the contract was contrary to the evidence. It is claimed that Elmer paid for the land with funds belonging to his parents. The record discloses otherwise. The funds used to pay for the three quarter sections were family funds equally available to any member of the family in accordance with the oral agreement of 1954. The money in that fund was accumulated as a result of Elmer's hard work and management and if it had not been for him there would have been no land, joint bank account, or certificates of deposit. To illustrate the parents' recognition of Elmer's efforts in accumulating money, there was evidence that Emma stated, "[w]hy, if it hadn't been for him (Elmer) they would have lost their place, cause they didn't have money enough to pay the taxes." Again, the advisory jury and the district court both found that the defendants' evidence clearly established the existence of the oral contract of 1954 set forth in the district court's findings of fact No. 17, and there was substantial evidence to support that finding. Moreover, the $15,000 paid for the

real estate became the sole property of Victor and Emma and was removed from the assets of the family fund.

The contention is made that Elmer paid for the real estate from the partnership account of Victor and Elmer. The plaintiff misconstrues the record. The partnership was entered into upon the advice of counsel, that a tax saving would be effected and it was the means by which Victor qualified for social security. Neither Victor nor Elmer understood income tax law or knew the nature or effect of a partnership return, or of a partnership. Furthermore, the signature card which set up the joint account between Victor and Elmer was clearly marked "joint" and not "partnership." Had Elmer and Victor intended this account to be a partnership account and the funds therein partnership funds, they would have instructed the bank to set up a partnership account. Instead they deliberately chose to establish a joint account with right of survivorship.

In *Corson v. Oakley,* supra, a brother and sister entered into an oral contract to conduct a business to purchase stocks and securities and that property accumulated should belong to them jointly with the right of survivorship. Title was usually taken in the name of the brother and sister as joint tenants or to the survivor of them. Some were taken in the name of the sister, and others were taken in the name of the brother and by him assigned to his sister. The brother was married and had children, and died. His administrator sought to bring the property into his estate. The sister testified the parties entered into the oral contract to buy stocks and securities jointly and if she should die, her brother would own the property, and if he should die, she would own the property by right of survivorship. She testified they "pooled" their interests and "we would be partners in the transactions." It was said:

"We cannot interpret this testimony to mean that the brother and sister were engaged in such a business adventure as the law characterizes as a partnership. She was merely using the common language of a layman to express the fact that she and her brother, pursuant to this agreement, were collaborating in the accumulation of securities which should belong to them jointly with right of survivorship. Such an agreement is valid under our law. (*Malone v. Sullivan,* 136 Kan. 193, 14 P. 2d 647.) (l. c. 531.)

Moreover, there was adequate monetary consideration to support Victor and Emma's deed to Elmer. As indicated, Victor and Emma reserved a life estate in the land and one-half of the mineral rights had previously been conveyed away. There was evidence that the value of the land was greater than $15,000, and there was also evidence the land had a value less than $15,000, but the ad-

visory jury and the district court found that the reasonable value was $15,000. Thus, the value established for the land was within the range of the evidence, which, standing alone, indicates that Elmer paid the reasonable or fair market value, or that there was adequate monetary consideration to support Victor and Emma's deed conveying title to Elmer.

In addition, the record shows that Elmer promised that, as an additional consideration for the sale of the land, he would take care of his parents and all their needs as long as they lived. Such an oral promise is of itself a sufficient consideration to support a deed conveying real estate where the obligation is neither disputed nor breached, and there is no undue influence, fraud or other illegality. (*Linn v. Blanton,* 111 Kan. 743, 208 Pac. 616, Syl. ¶ 3; *Smith v. McHenry,* 111 Kan. 659, 207 Pac. 1108; *In re Estate of Timken,* 177 Kan. 545, 280 P. 2d 561.) See, also, *Roberts v. Coffey, Administrator,* 198 Kan. 695, 701, 426 P. 2d 30, and cases cited. Elmer's oral promise is not disputed and there can be no doubt that it was never breached. He fully performed his agreement with the care and affection of a loving son. After Victor became senile, he was quite a care and Elmer and Viola had the unpleasant task of caring for him like a baby, which they willingly did. Victor was kept in the family home, and in the last days of his life, Elmer slept with him so he would not have to tie his father down to keep him in bed. There can be no question as to the sufficiency or adequacy of the consideration to support the deed.

The plaintiff's claim that in addition to getting a deed to his parents' land, Elmer also secured two bills of sale from them for all of the farm machinery, tools and cattle which had been purchased from Victor and Elmer's joint account. It is claimed that findings of fact No. 16 is not supported by the evidence and that Elmer's parents did not have independent advice concerning the execution of the two bills of sale. The record discloses that in February 1955, Victor and Emma agreed to and did execute a bill of sale in Elmer's favor, transferring all of their interest in the machinery, tools and cattle. On January 19, 1956, a second bill of sale was executed by them in favor of Elmer covering all machinery and cattle which had been acquired or purchased since February 1, 1955.

The bills of sale were prepared by Mr. Vieux in his office when Victor, Emma and Elmer were present. At that time, Victor and Emma told Vieux that Elmer had made all the money and was doing all the work and they wanted to convey the property to him. It is

claimed that Mr. Vieux offered no advice to Victor and Emma and that no independent advice was disclosed by the record. The contention must be considered in connection with the district court's findings of fact and conclusions of law to the effect that the evidence offered by the defendants overcame any presumption of undue influence, duress or fraud involved in any transfer made by Victor and Emma to either Elmer or Viola and that the weight of the evidence established such transfers were the free, knowing, voluntary and understanding acts of both parents. As heretofore noted, the machinery, tools and cattle were a part of the personal property included in the oral agreement of 1954 and had been accumulated as a result of Elmer's work and efforts on the Carlson farm and in working for others, and merely confirmed Elmer's interest in property then owned or thereafter acquired as a result of his efforts. As indicated, that agreement was performed to the complete satisfaction of the parties for nine years and the consideration which sustained that agreement likewise sustained the transfer of the property in question to Elmer outright. The effect of the bills of sale was to place property belonging to Victor, Emma and Elmer into the separate and independent ownership of Elmer. It has been held that joint tenants may contract with each other with respect to the property, and joint tenants may transfer their interest to another tenant which does not destroy the joint tenancy as to the remainder of the property. (48 C. J. S., Joint Tenancy, § 10, p. 933.) We are of the opinion there was substantial evidence to support the district court's findings of fact and conclusions of law on this point.

The plaintiff makes the point that the oral joint tenancy contract entered into in 1954 lacked the necessary ingredients to make it a legal agreement and cites *Carson, Executrix, v. Ellis,* 186 Kan. 112, 348 P. 2d 807. We think what was said and held in *Edwards v. Ledford,* supra, answers the contention. In the opinion it was said:

"Appellants make a point that the creation and continued existence of a joint tenancy requires four unities: (1) unity of interest, (2) unity of title, (3) unity of time, and (4) unity of possession; and that unity of interest and unity of possession are lacking here. The identical argument was advanced and rejected in *Simonich,* supra. What we said there is controlling here. We find evidence that Mr. Edwards intended to create a present interest in himself and Millie when the account was established. The same may be said regarding the 'D. A. or T. C. Edwards' account. In each instance Mr. Edwards was fully cognizant of the fact that his daughter or son could draw against the respective accounts any time during his lifetime, and upon his death the balance in each account would be the property of the survivor. Both Millie

and T. C., along with their father, had access to each of the passbooks to the respective accounts. Under all the circumstances, each of the unities requisite to the creation of a joint tenancy was present." (1. c. 526, 527.)

It is next contended that the district court erred in refusing to find that Viola stood in a fiduciary relationship with her parents and in failing to find she violated that relationship. The court's findings of fact No. 20 was to the effect that every check drawn on the parents' account to purchase bonds or other securities and investments for Viola and her daughter bore the authentic and true signatures of the parents and that the signatures were placed there freely, knowingly and understandingly and were not the result of undue influence, fraud or deceit. The record discloses that on June 1, 1953, Viola endorsed her mother's name to a certificate of deposit issued by the Farmers National Bank of Oberlin. A new certificate of deposit in the same amount was reissued in her mother's name and Viola did not profit from the transaction in any way.

The district court's refusal to find that Viola stood in a confidential relationship to her parents was in effect a negative finding, and it has been consistently held that an appellate court will not set aside a negative finding of fact by nullifying a district court's belief of evidence if such evidence is limited in quantity, or its weight and credibility questionable, or if the evidence may be disregarded for any reason. (*King v. Robbins*, 201 Kan. 748, 443 P. 2d 308.) See, also, *Schroeder v. Richardson*, 196 Kan. 363, 411 P. 2d 670; *Montgomery v. Manos*, 201 Kan. 302, 440 P. 2d 629.

Other points have been urged but what has been said disposes of this litigation. It would serve no useful purpose to prolong this opinion by discussing them, or to detail the many financial transactions of the Carlson family. It may be said the plaintiff alleged in his pleading that Elmer robbed his senile, irrational and confused father, and charged Elmer and Viola with obtaining property by undue influence, and further charged them with forging certain checks and certificates of deposit. The plaintiff produced his evidence on all of the issues and charges during an extended trial. The jury and the district court did not believe that evidence and found against the plaintiff. Even now the plaintiff concedes that Victor was mentally competent when he executed the deed in 1957—three years after the making of the oral contract in 1954 which both

the court and the advisory jury found was entered into. It was never contended that Emma was mentally incompetent when she joined Victor in executing the deed in 1957 or at any of the other material times in question.

If there is any one fact which stands out in this record, it is that nearly everything claimed by the plaintiff to belong to the estates of Victor and Emma was earned by Elmer and represents his life's work. Because Elmer was one of those rare individuals who had a Midas touch with respect to accumulation and management of property, and because he stayed home and took care of his parents and followed their long-established banking methods, everything he earned and possessed was placed in jeopardy. If the testimony of Elmer is to be believed, there is no question but that the judgment rendered below was correct. An advisory jury of twelve men and the district court believed that testimony, and we think that equity and justice was served. We enter an order affirming the judgment rendered below.

FONTRON, J., not participating.